DeFUNIS et al. *v.* ODEGAARD et al.

No. 73–235.   Argued February 26, 1974—Decided April 23, 1974

*Josef Diamond* argued the cause for petitioners.   With him on the briefs was *Lyle L. Iversen.*

*Slade Gorton*, Attorney General of Washington, argued the cause for respondents. With him on the brief was *James B. Wilson*, Senior Assistant Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed by *Milton A. Smith, Gerard C. Smetana*, and *Jerry Kronenberg* for the Chamber of Commerce of the United States; by *J. Albert Woll, Laurence Gold*, and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations; by *Theodore R. Mann* for the American Jewish Congress; by *David I. Caplan* for the Jewish Rights Council; by *Anthony J. Fornelli, Thaddeus L. Kowalski*, and *Samuel Rabinove* for the Advocate Society et al.; and by *Alexander M. Bickel, Philip B. Kurland, Larry M. Lavinsky*, and *Arnold Forster* for the Anti-Defamation League of B'nai B'rith.

Briefs of *amici curiae* urging affirmance were filed by *William J. Brown*, Attorney General, and *Andrew J. Ruzicho, Earl M. Manz*, and *Stephen J. Simmons*, Assistant Attorneys General, for the State of Ohio; by *John P. Harris* for the city of Seattle; by *Fletcher N. Baldwin, Jr.*, and *Chesterfield Smith* for the American Bar Assn.; by *Archibald Cox, James N. Bierman, James A. Sharaf*, and *Daniel Steiner* for the President and Fellows of Harvard College; by *J. Harold Flannery* for the Center for Law and Education, Harvard University; by *Frank Askin* and *Norman Amaker* for the Board of Governors of Rutgers, the State University of New Jersey, et al.; by *Edgar S. Cahn* and *Jean Camper Cahn* for the Deans of the Antioch School of Law; by *Erwin N. Griswold* and *Clifford C. Alloway* for the Association of American Law Schools; by *John Holt Myers* for the Association of American Medical Colleges; by *Howard A. Glickstein* for a Group of Law School Deans; by *Harry B. Reese* and *Peter Martin* for the Law School Admission Council; by *Sanford Jay Rosen, Herbert Teitelbaum*, and *Melvin L. Wulf* for the Mexican American Legal Defense and Educational Fund et al.; by *Cruz Reynoso* and *Robert B. McKay* for the Council on Legal Education Opportunity; by *Roswell B. Perkins, Kenneth C. Bass III, David S. Tatel*, and *R. Stephen Browning* for the Lawyers' Committee for Civil Rights Under Law; by *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston, Jeffry A. Mintz, Louis H. Pollak*, and *John Baker* for the NAACP Legal Defense and Educational Fund, Inc.; by *Derrick A. Bell, Jr.*, for the National Conference of Black Lawyers; by *Bruce R. Greene* and *Herbert Becker* for the American Indian Law Students Assn., Inc., et al.; by *Clifford Sweet, C. Lyonel*

PER CURIAM.

In 1971 the petitioner Marco DeFunis, Jr.,[1] applied for admission as a first-year student at the University of Washington Law School, a state-operated institution. The size of the incoming first-year class was to be limited to 150 persons, and the Law School received some 1,600 applications for these 150 places. DeFunis was eventually notified that he had been denied admission. He thereupon commenced this suit in a Washington trial court, contending that the procedures and criteria employed by the Law School Admissions Committee invidiously discriminated against him on account of his race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

DeFunis brought the suit on behalf of himself alone, and not as the representative of any class, against the various respondents, who are officers, faculty members, and members of the Board of Regents of the University of Washington. He asked the trial court to issue a mandatory injunction commanding the respondents to admit him as a member of the first-year class entering in September 1971, on the ground that the Law School admissions policy had resulted in the unconstitutional denial of his application for admission. The trial court agreed with his claim and granted the requested relief.

---

Jones, Dennis R. Yeager, E. Richard Larson, Nathaniel R. Jones, Michael H. Terry, Joseph A. Matera, and C. Christopher Brown for the Legal Aid Society of Alameda County et al.; by Peter Van N. Lockwood, David Bonderman, Sylvia Roberts, and David Rubin for the National Organization for Women Legal Defense and Education Fund, Inc., et al.; and by Joseph L. Rauh, Jr., for the National Council of Jewish Women et al.

[1] Also included as petitioners are DeFunis' parents and his wife. Hereafter, the singular form "petitioner" is used.

DeFunis was, accordingly, admitted to the Law School and began his legal studies there in the fall of 1971. On appeal, the Washington Supreme. Court reversed the judgment of the trial court and held that the Law School admissions policy did not violate the Constitution. By this time DeFunis was in his second year at the Law School.

He then petitioned this Court for a writ of certiorari, and MR. JUSTICE DOUGLAS, as Circuit Justice, stayed the judgment of the Washington Supreme Court pending the "final disposition of the case by this Court." By virtue. of this stay, DeFunis has remained in law school, and was in the first term of his third and final year when this Court first considered his certiorari petition in the fall of 1973. Because of our concern that DeFunis' third-year standing in the Law School might have rendered this case moot, we requested the parties to brief the question of mootness before we acted on the petition. In response, both sides contended that the case was not moot. The respondents indicated that, if the decision of the Washington Supreme Court were permitted to stand, the petitioner could complete the term for which he was then enrolled but would have to apply to the faculty for permission to continue in the school before he could register for another term.[2]

We granted the petition for certiorari on November 19, 1973. 414 U. S. 1038. The case was in due course orally argued on February 26, 1974.

In response to questions raised from the bench during the oral argument, counsel for the petitioner has informed the Court that DeFunis has now registered "for his final

---

[2] By contrast, in their response to the petition for certiorari, the respondents had stated that DeFunis "will complete his third year [of law school] and be awarded his J. D. degree at the end of the 1973–74 academic year regardless of the outcome of this appeal."

quarter in law school." Counsel for the respondents have made clear that the Law School will not in any way seek to abrogate this registration.[3]   In light of DeFunis' recent registration for the last quarter of his final law school year, and the Law School's assurance that his registration is fully effective, the insistent question again arises whether this case is not moot, and to that question we now turn.

The starting point for analysis is the familiar proposition that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina* v. *Rice,* 404 U. S. 244 246 (1971). The inability of the federal judiciary "to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Liner* v. *Jafco, Inc.,* 375 U. S. 301, 306 n. 3 (1964); see also *Powell* v. *McCormack,* 395 U. S. 486, 496 n. 7 (1969); *Sibron* v. *New York,* 392 U. S. 40, 50 n. 8 (1968). Although as a matter of Washington state law it appears that this case would be saved from mootness by "the great public interest in the continuing issues raised by this appeal," 82 Wash. 2d 11, 23 n. 6, 507 P. 2d 1169, 1177 n. 6 (1973), the fact remains that under Art. III "[e]ven in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction." *North Carolina* v. *Rice, supra,* at 246.

The respondents have represented that, without regard to the ultimate resolution of the issues in this case,

---

[3] In their memorandum on the question of mootness, counsel for the respondents unequivocally stated: "If Mr. DeFunis registers for the spring quarter under the existing order of this court during the registration period from February 20, 1974, to March 1, 1974, that registration would not be canceled unilaterally by the university regardless of the outcome of this litigation."

DeFunis will remain a student in the Law School for the duration of any term in which he has already enrolled. Since he has now registered for his final term, it is evident that he will be given an opportunity to complete all academic and other requirements for graduation, and, if he does so, will receive his diploma regardless of any decision this Court might reach on the merits of this case. In short, all parties agree that DeFunis is now entitled to complete his legal studies at the University of Washington and to receive his degree from that institution. A determination by this Court of the legal issues tendered by the parties is no longer necessary to compel that result, and could not serve to prevent it. DeFunis did not cast his suit as a class action, and the only remedy he requested was an injunction commanding his admission to the Law School. He was not only accorded that remedy, but he now has also been irrevocably admitted to the final term of the final year of the Law School course. The controversy between the parties has thus clearly ceased to be "definite and concrete" and no longer "touch[es] the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240–241 (1937).

It matters not that these circumstances partially stem from a policy decision on the part of the respondent Law School authorities. The respondents, through their counsel, the Attorney General of the State, have professionally represented that in no event will the status of DeFunis now be affected by any view this Court might express on the merits of this controversy. And it has been the settled practice of the Court, in contexts no less significant, fully to accept representations such as these as parameters for decision. See *Gerende* v. *Election Board,* 341 U. S. 56 (1951); *Whitehill* v. *Elkins,* 389 U. S. 54, 57–58 (1967); *Ehlert* v. *United States,* 402 U. S. 99.

107 (1971); cf. *Law Students Research Council* v. *Wadmond*, 401 U. S. 154, 162–163 (1971).

There is a line of decisions in this Court standing for the proposition that the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.,* does not make the case moot." *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632 (1953); *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 308–310 (1897); *Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37, 43 (1944); *Gray* v. *Sanders,* 372 U. S. 368, 376 (1963); *United States* v. *Phosphate Export Assn.,* 393 U. S. 199, 202–203 (1968). These decisions and the doctrine they reflect would be quite relevant if the question of mootness here had arisen by reason of a unilateral change in the *admissions procedures* of the Law School. For it was the admissions procedures that were the target of this litigation, and a voluntary cessation of the admissions practices complained of could make this case moot only if it could be said with assurance "that 'there is no reasonable expectation that the wrong will be repeated.'" *United States* v. *W. T. Grant Co., supra,* at 633. Otherwise, "[t]he defendant is free to return to his old ways," *id.,* at 632, and this fact would be enough to prevent mootness because of the "public interest in having the legality of the practices settled." *Ibid.* But mootness in-the present case depends not at all upon a "voluntary cessation" of the admissions practices that were the subject of this litigation. It depends, instead, upon the simple fact that DeFunis is now in the final quarter of the final year of his course of study, and the settled and unchallenged policy of the Law School to permit him to complete the term for which he is now enrolled.

It might also be suggested that this case presents a question that is "capable of repetition, yet evading

review," *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911); *Roe* v. *Wade,* 410 U. S. 113, 125 (1973), and is thus amenable to federal adjudication even though it might otherwise be considered moot. But DeFunis will never again be required to run the gantlet of the Law School's admission process, and so the question is certainly not "capable of repetition" so far as he is concerned. Moreover, just because this particular case did not reach the Court until the eve of the petitioner's graduation from law school, it hardly follows that the issue he raises will in the future evade review. If the admissions procedures of the Law School remain unchanged,[4] there is no reason to suppose that a subsequent case attacking those procedures will not come with relative speed to this Court, now that the Supreme Court of Washington has spoken. This case, therefore, in no way presents the exceptional situation in which the *Southern Pacific Terminal* doctrine might permit a departure from "[t]he usual rule in federal cases . . . that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." *Roe* v. *Wade, supra,* at 125; *United States* v. *Munsingwear, Inc.,* 340 U. S. 36 (1950).

Because the petitioner will complete his law school studies at the end of the term for which he has now registered regardless of any decision this Court might reach on the merits of this litigation, we conclude that the Court cannot, consistently with the limitations of

[4] In response to an inquiry from the Court, counsel for the respondents has advised that some changes have been made in the admissions procedures "for the applicants seeking admission to the University of Washington law school for the academic year commencing September, 1974." The respondents' counsel states, however, that "[these] changes do not affect the policy challenged by the petitioners . . . in that . . . special consideration still is given to applicants from 'certain ethnic groups.'"

Art. III of the Constitution, consider the substantive constitutional issues tendered by the parties.[5] Accordingly, the judgment of the Supreme Court of Washington is vacated, and the cause is remanded for such proceedings as by that court may be deemed appropriate.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

I agree with MR. JUSTICE BRENNAN that this case is not moot, and because of the significance of the issues raised I think it is important to reach the merits.

## I

The University of Washington Law School received 1,601 applications for admission to its first-year class beginning in September 1971. There were spaces available for only about 150 students, but in order to enroll this number the school eventually offered admission to 275 applicants. All applicants were put into two groups, one of which was considered under the minority admissions program. Thirty-seven of those offered admission had indicated on an optional question on their application that their "dominant" ethnic origin was either black, Chicano, American Indian, or Filipino, the four groups included in the minority admissions program. Answers to this optional question were apparently the sole basis

---

[5] It is suggested in dissent that "[a]ny number of unexpected events—illness, economic necessity, even academic failure—might prevent his graduation at the end of the term." *Post*, at 348. "But such speculative contingencies afford no basis for our passing on the substantive issues [the petitioner] would have us decide," *Hall* v. *Beals*, 396 U. S. 45, 49 (1969), in the absence of "evidence that this is a prospect of 'immediacy and reality.'" *Golden* v. *Zwickler*, 394 U. S. 103, 109 (1969); *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941).

upon which eligibility for the program was determined. Eighteen of these 37 actually enrolled in the Law School.

In general, the admissions process proceeded as follows: An index called the Predicted First Year Average (Average) was calculated for each applicant on the basis of a formula combining the applicant's score on the Law School Admission Test (LSAT) and his grades in his last two years in college.[1] On the basis of its experience with previous years' applications, the Admissions Committee, consisting of faculty, administration, and students, concluded that the most outstanding applicants were those with averages above 77; the highest average of any applicant was 81. Applicants with averages above 77 were considered as their applications arrived by random distribution of their files to the members of the Committee who would read them and report their recommendations back to the Committee. As a result of the first three Committee meetings in February, March, and April 1971, 78 applicants from this group were admitted, although virtually no other applicants were offered admission this early.[2] By the final conclusion of

---

[1] The grades are calculated on a conventional 4.0 scale, and the LSAT is scored on a scale ranging from 200 to 800. A Writing Test given on the same day as the LSAT and administered with it is also included in the formula; it is scored on a scale of 20 to 80. The Admissions Committee combines these scores into the Average by calculating the sum of 51.3, $3.4751 \times$ the grade-point average, $.0159 \times$ LSAT score, and $.0456 \times$ the Writing Test score. App. 24. For a brief discussion of the use of the LSAT in combination with undergraduate grades to predict law school success, see Winterbottom, Comments on "A Study of the Criteria for Legal Education and Admission to the Bar," An Article by Dr. Thomas M. Goolsby, Jr., 21 J. Legal Ed. 75 (1968).

[2] The only other substantial group admitted at this point were 19 "military" applicants. These were students who had previously been admitted to the school but who had either been unable to come, or forced to leave during their tenure, because of the draft. They were

322

the admissions process in August 1971, 147 applicants
with averages above 77 had been admitted, including
all applicants with averages above 78, and 93 of 105
applicants with averages between 77 and 78.

Also beginning early in the admissions process was
the culling out of applicants with averages below 74.5.
These were reviewed by the Chairman of the Admissions
Committee, who had the authority to reject them sum-
marily without further consideration by the rest of the
Committee. A small number of these applications were
saved by the Chairman for Committee consideration on
the basis of information in the file indicating greater
promise than suggested by the Average. Finally during
the early months the Committee accumulated the appli-
cations of those with averages between 74.5 and 77 to
be considered at a later time when most of the applica-
tions had been received and thus could be compared
with one another. Since DeFunis' average was 76.23,
he was in this middle group.

Beginning in their May meeting the Committee con-
sidered this middle group of applicants, whose folders
had been randomly distributed to Committee members
for their recommendations to the Committee. Also con-
sidered at this time were remaining applicants with aver-
ages below 74.5 who had not been summarily rejected,
and some of those with averages above 77 who had not
been summarily admitted, but instead held for further
consideration. Each Committee member would consider
the applications competitively, following rough guide-

given preferential treatment upon reapplication after completing
their military obligation. Since neither party has raised any issue
concerning this group of applicants, the remaining consideration of
the admissions procedure will not discuss them. Four minority appli-
cants were also admitted at this time, although none apparently
had scores above 77. App. 31. Their admission was presumably
pursuant to the procedure for minority applicants described below.

lines as to the proportion who could be offered admission. After the Committee had extended offers of admission to somewhat over 200 applicants, a waiting list was constructed in the same fashion, and was divided into four groups ranked by the Committee's assessment of their applications. DeFunis was on this waiting list, but was ranked in the lowest quarter. He was ultimately told in August 1971 that there would be no room for him.

Applicants who had indicated on their application forms that they were either black, Chicano, American Indian, or Filipino were treated differently in several respects. Whatever their Averages, none were given to the Committee Chairman for consideration of summary rejection, nor were they distributed randomly among Committee members for consideration along with the other applications. Instead, all applications of black students were assigned separately to two particular Committee members: a first-year black law student on the Committee, and a professor on the Committee who had worked the previous summer in a special program for disadvantaged college students considering application to the Law School.[3] Applications from among the other three minority groups were assigned to an assistant dean who was on the Committee. The minority applications. while considered competitively with one another, were never directly compared to the remaining applications, either by the subcommittee or by the full Committee. As in the admissions process generally, the Committee sought to find "within the minority category, those persons who we thought had the highest probability of

---

[3] This was a Council on Legal Education Opportunities program, federally funded by the Office of Economic Opportunity and sponsored by the American Bar Association, the Association of American Law Schools, the National Bar Association, and the Law School Admissions Council.

succeeding in Law School." [4]   In reviewing the minority
applications, the Committee attached less weight to the
Average "in making a total judgmental evaluation as to
the relative ability of the particular applicant to succeed
in law school." 82 Wash. 2d 11, 21, 507 P. 2d 1169,
1175. In its publicly distributed Guide to Applicants,
the Committee explained that "[a]n applicant's racial or
ethnic background was considered as one factor in our
general. attempt to convert formal credentials into real-
istic predictions." [5]

Thirty-seven minority applicants were admitted under
this procedure.    Of these, 36 had Averages below DeFunis'
76.23, and 30 had Averages below 74.5, and thus would
ordinarily have been summarily rejected by the Chair-
man.   There were also 48 nonminority applicants admitted
who had Averages below DeFunis.    Twenty-three of
these were returning veterans, see n. 2, *supra,* and 25 were
others who presumably were admitted because of other

---

[4] Testimony of the Chairman of the Admissions Committee, State-
ment of Facts 353.

[5] The Guide to Applicants explained:

"We gauged the potential for outstanding performance in law
school not only from the existence of high test scores and grade
point averages, but also from careful analysis of recommendations,
the quality of work in difficult analytical seminars, courses, and
writing programs, the academic standards of the school attended by
the applicant, the applicant's graduate work (if any), and the nature
of the applicant's employment (if any), since graduation.

"An applicant's ability to make significant contributions to law
school classes and the community at large was assessed from such
factors as his extracurricular and community activities, employment,
and general background.

"We gave no preference to, but did not discriminate against,
either Washington residents or women in making our determinations.
An applicant's racial or ethnic background was considered as one
factor in our general attempt to convert formal credentials into
realistic predictions." 82 Wash. 2d 11, 18–19, 507 P. 2d 1169, 1174.

factors in their applications that made them attractive candidates despite their relatively low Averages.

It is reasonable to conclude from the above facts that while other factors were considered by the Committee, and were on occasion crucial, the Average was for most applicants a heavily weighted factor, and was at the extremes virtually dispositive.[6] A different balance was apparently struck, however, with regard to the minority applicants. Indeed, at oral argument, the respondents' counsel advised us that were the minority applicants considered under the same procedure as was generally used, none of those who eventually enrolled at the Law School would have been admitted.

The educational policy choices confronting a university admissions committee are not ordinarily a subject for judicial oversight; clearly it is not for us but for the law school to decide which tests to employ, how heavily to weigh recommendations from professors or undergraduate grades, and what level of achievement on the chosen criteria are sufficient to demonstrate that the candidate is qualified for admission. What places this case in a special category is the fact that the school did not choose one set of criteria but two, and then determined which to apply to a given applicant on the basis of his race. The

---

[6] The respondents provided the following table in response to an interrogatory during the proceedings in the state court:

| Predicted First Year Averages | Number of Applications Received | Number Accepted |
|---|---|---|
| 81 | 1 | 1 |
| 80 | 2 | 2 |
| 79 | 11 | 11 |
| 78 | 42 | 42 |
| 77 | 105 | 93 |
| 76 | 169 | 53 |
| 75 | 210 | 22 |

App. 34.

Committee adopted this policy in order to achieve "a reasonable representation" of minority groups in the Law School. 82 Wash. 2d, at 20, 507 P. 2d, at 1175. Altho gh it may be speculated that the Committee sought to rectify what it perceived to be cultural or racial biases in the LSAT or in the candidates' undergraduate records, the record in this case is devoid of any evidence of such bias, and the school has not sought to justify its procedures on this basis.

Although testifying that "[w]e do not have a quota . . ." the Law School dean explained that "[w]e want a reasonable representation. We will go down to reach it if we can," without "taking people who are unqualified in an absolute sense . . . ." Statement of Facts 420. By "unqualified in an absolute sense" the dean meant candidates who "have no reasonable probable likelihood of having a chance of succeeding in the study of law . . . ." *Ibid.* But the dean conceded that in "reaching," the school does take "some minority students who at least, viewed as a group, have a less such likelihood than the majority student group taken as a whole." *Id.,* at 423.

"Q. Of those who have made application to go to the law school, I am saying you are not taking the best qualified?

"A. In total?

"Q. In total.

"A. In using that definition, yes." *Id.,* at 423–424.

It thus appears that by the Committee's own assessment, it admitted minority students who, by the tests given, seemed less qualified than some white students who were not accepted, in order to achieve a "reasonable representation." In this regard it may be pointed out that for the year 1969–1970—two years before the class to which DeFunis was seeking admission—the Law School

reported an enrollment of eight black students out of a total of 356.[7] Defendants' Ex. 7. That percentage, approximately 2.2%, compares to a percentage of blacks in the population of Washington of approximately 2.1%.[8]

## II

There was a time when law schools could follow tha advice of Wigmore, who believed that "the way to find out whether a boy has the makings of a competent lawyer is to see what he can do in a first year of law studies." Wigmore, Juristic Psychopoyemetrology—Or, How to Find Out Whether a Boy Has the Makings of a Lawyer, 24 Ill. L. Rev. 454, 463-464 (1929). In those days there were enough spaces to admit every applicant who met minimal credentials, and they all could be given the opportunity to prove themselves at law school. But by the 1920's many law schools found that they could not admit all minimally qualified applicants, and some selection process began.[9] The pressure to use some kind of admissions test mounted, and a number of schools instituted them. One early precursor to the modern day LSAT was the Ferson-Stoddard Law Aptitude examination. Wigmore conducted his own study of that test with 50 student volunteers, and concluded that it "had no substantial practical value." Id., at 463. But his conclusions were not accepted, and the harried law

---

[7] Although there is apparently no evidence in point in the record, respondents suggest that at least some of these eight students were also admitted on a preferential basis. Brief for Respondents 40 n. 27.

[8] United States Bureau of the Census, Census of Population: 1970, General Population Characteristics, Washington, Final Report PC (1)—B49, Table 18.

[9] For a history of gradual acceptance among law schools of standardized tests as an admission tool, see Ramsey, Law School Admissions: Science, Art, or Hunch?, 12 J. Legal Ed. 503 (1960).

328

schools still sought some kind of admissions test which would simplify the process of judging applicants, and in 1948 the LSAT was born. It has been with us ever since.[10]

The test purports to predict how successful the applicant will be in his first year of law school, and consists of a few hours' worth of multiple-choice questions. But the answers the student can give to a multiple-choice question are limited by the creativity and intelligence of the test-maker; the student with a better or more original understanding of the problem than the test-maker may realize that none of the alternative answers are any good, but there is no way for him to demonstrate his understanding. "It is obvious from the nature of the tests that they do not give the candidate a significant opportunity to express himself. If he is subtle in his choice of answers it will go against him; and yet there is no other way for him to show any individuality. If he is strong-minded, nonconformist, unusual, original, or creative—as so many of the truly important people are—he must stifle his impulses and conform as best he can to the norms that the multiple-choice testers set up in their unimaginative, scientific way. The more profoundly gifted the candidate is, the more his resentment will rise against the mental strait jacket into which the testers would force his mind." B. Hoffmann, The Tyranny of Testing 91–92 (1962).

Those who make the tests and the law schools which use them point, of course, to the high correlations between the test scores and the grades at law school the first year. *E. g.*, Winterbottom, Comments on "A Study of the Criteria for Legal Education and Admission to the

---

[10] For a survey of the use of the LSAT by American law schools as of 1965, see Runneborg & Radford, The LSAT: A Survey of Actual Practice, 18 J. Legal Ed. 313 (1966).

Bar," An Article by Dr. Thomas M. Goolsby, Jr., 21 J. Legal Ed. 75 (1968).. Certainly the tests do seem to do better than chance. But they do not have the value that their deceptively precise scoring system suggests. The proponents' own data show that, for example, most of those scoring in the bottom 20% on the test do better than that in law school—indeed six of every 100 of them will be in the *top* 20% of their law school class. *Id.*, at 79. And no one knows how many of those who were not admitted because of their test scores would in fact have done well were they given the chance. There are many relevant factors, such as motivation, cultural backgrounds of specific minorities that the test cannot measure, and they inevitably must impair its value as a predictor.[11] Of course, the law school that admits only those with the highest test scores finds that on the average they do much better, and thus the test is a convenient tool for the admissions committee. The price is paid by the able student who for unknown reasons did not achieve that high score—perhaps even the minority with a different cultural background. Some tests, at least in the past, have been aimed at eliminating Jews.

The school can safely conclude that the applicant with a score of 750 should be admitted before one with a score of 500. The problem is that in many cases the choice will be between 643 and 602 or 574 and 528. The numbers create an illusion of difference tending to overwhelm other factors. "The wiser testers are well aware of the defects of the multiple-choice format and the danger of placing reliance on any one method of assessment to the exclusion of all others. What is distressing is how little their caveats have impressed the people who succumb to the propaganda of the test-

---

[11] Rock, Motivation, Moderators, and Test Bias, 19'0 U. Tol. L. Rev. 527, 535.

makers and use these tests mechanically as though they were a valid substitute for judgment." Hoffmann, *supra,* at 215.

Of course, the tests are not the only thing considered; here they were combined with the prelaw grades to produce a new number called the Average. The grades have their own problems; one school's A is another school's C. And even to the extent that this formula predicts law school grades, its value is limited. The law student with lower grades may in the long pull of a legal career surpass those at the top of the class. "[L]aw school admissions criteria have operated within a hermetically sealed system; it is now beginning to leak. The traditional combination of LSAT and GPA [undergraduate grade point average] may have provided acceptable predictors of likely performance in law school in the past. . . . [But] [t]here is no clear evidence that the LSAT and GPA provide particularly good evaluators of the intrinsic or enriched ability of an individual to perform as a law student or lawyer in a functioning society undergoing change. Nor is there any clear evidence that grades and other evaluators of law school performance, and the bar examination, are particularly good predictors of competence or success as a lawyer." Rosen, Equalizing Access to Legal Education: Special Programs for Law Students Who Are Not Admissible by Traditional Criteria, 1970 U. Tol. L. Rev. 321, 332–333.

But, by whatever techniques, the law school must make choices. Neither party has challenged the validity of the Average employed here as an admissions tool, and therefore consideration of its possible deficiencies is not presented as an issue. The Law School presented no evidence to show that adjustments in the process employed were used in order validly to compare applicants of different races; instead, it chose to avoid making such comparisons. Finally,

although the Committee did consider other information in the files of all applicants, the Law School has made no effort to show that it was because of these additional factors that it admitted minority applicants who would otherwise have been rejected. To the contrary, the school appears to have conceded that by its own assessment—taking all factors into account—it admitted minority applicants who would have been rejected had they been white. We have no choice but to evaluate the Law School's case as it has been made.

## III

The Equal Protection Clause did not enact a requirement that law schools employ as the sole criterion for admissions a formula based upon the LSAT and undergraduate grades, nor does it prohibit law schools from evaluating an applicant's prior achievements in light of the barriers that he had to overcome. A black applicant who pulled himself out of the ghetto into a junior college may thereby demonstrate a level of motivation, perseverance, and ability that would lead a fairminded admissions committee to conclude that he shows more promise for law study than the son of a rich alumnus who achieved better grades at Harvard. That applicant would be offered admission not because he is black, but because as an individual he has shown he has the potential, while the Harvard man may have taken less advantage of the vastly superior opportunities offered him. Because of the weight of the prior handicaps, that black applicant may not realize his full potential in the first year of law school, or even in the full three years, but in the long pull of a legal career his achievements may far outstrip those of his classmates whose earlier records appeared superior by conventional criteria. There is currently no test available to the Admissions

Committee that can predict such possibilities with assurance, but the Committee may nevertheless seek to gauge it as best it can, and weigh this factor in its decisions. Such a policy would not be limited to blacks, or Chicanos or Filipinos, or American Indians, although undoubtedly groups such as these may in practice be the principal beneficiaries of it. But a poor Appalachian white, or a second generation Chinese in San Francisco, or some other American whose lineage is so diverse as to defy ethnic labels, may demonstrate similar potential and thus be accorded favorable consideration by the Committee.

The difference between such a policy and the one presented by this case is that the Committee would be making decisions on the basis of individual attributes, rather than according a preference solely on the basis of race. To be sure, the racial preference here was not absolute— the Committee did not admit all applicants from the four favored groups. But it did accord all such applicants a preference by applying, to an extent not precisely ascertainable from the record, different standards by which to judge their applications, with the result that the Committee admitted minority applicants who, in the school's own judgment, were less promising than other applicants who were rejected. Furthermore, it is apparent that because the Admissions Committee compared minority applicants only with one another, it was necessary to reserve some proportion of the class for them, even if at the outset a precise number of places were not set aside.[12] That proportion, apparently 15% to

---

[12] At the outset the Committee may have chosen only a range, with the precise number to be determined later in the process as the total number of minority applicants, and some tentative assessment of their quality, could be determined. This appears to be the current articulated policy, see App. to this opinion § 6, and we are advised by the respondents that § 6 "represents a more formal statement of the policy which was in effect in 1971 . . . but does not

20%, was chosen because the school determined it to be "reasonable," [13] although no explanation is provided as to how that number rather than some other was found appropriate. Without becoming embroiled in a semantic debate over whether this practice constitutes a "quota," it is clear that, given the limitation on the total number of applicants who could be accepted, this policy did reduce the total number of places for which DeFunis could compete—solely on account of his race. Thus, as the Washington Supreme Court concluded, whatever label one wishes to apply to it, "the minority admissions policy is certainly not benign with respect to nonminority students who are displaced by it." 82 Wash. 2d, at 32, 507 P. 2d, at 1182. A finding that the state school employed a racial classification in selecting its students subjects it to the strictest scrutiny under the Equal Protection Clause.

The consideration of race as a measure of an applicant's qualification normally introduces a capricious and irrelevant factor working an invidious discrimination, *Anderson* v. *Martin,* 375 U. S. 399, 402; *Loving* v. *Virginia,* 388 U. S. 1, 10; *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 668. Once race is a starting point educators and courts are immediately embroiled in competing claims of different racial and ethnic groups that would make difficult, manageable standards consistent

---

represent any change in policy." Letter to the Court dated March 19, 1974, p. 1. The fact that the Committee did not set a precise number in advance is obviously irrelevant to the legal analysis. Nor does it matter that there is some minimal level of achievement below which the Committee would not reach in order to achieve its stated goal as to the proportion of the class reserved for minority groups, so long as the Committee was willing, in order to achieve that goal, to admit minority applicants who, in the Committee's own judgment, were less qualified than other rejected applicants and who would not otherwise have been admitted.

[13] See n. 12, *supra,* and App. to this opinion § 6.

with the Equal Protection Clause. "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Loving, supra,* at 10. The Law School's admissions policy cannot be reconciled with that purpose, unless cultural standards of a diverse rather than a homogeneous society are taken into account. The reason is that professional persons, particularly lawyers, are not selected for life in a computerized society. The Indian who walks to the beat of Chief Seattle of the Muckleshoot Tribe in Washington [14] has a different culture from examiners at law schools.

The key to the problem is the consideration of each application *in a racially neutral way.* Since the LSAT reflects questions touching on cultural backgrounds, the Admissions Committee acted properly in my view in setting minority applications apart for separate processing. These minorities have cultural backgrounds that are vastly different from the dominant Caucasian. Many Eskimos, American Indians, Filipinos, Chicanos, Asian Indians, Burmese, and Africans come from such disparate backgrounds that a test sensitively tuned for most applicants would be wide of the mark for many minorities.

The melting pot is not designed to homogenize people, making them uniform in consistency. The melting pot as I understand it is a figure of speech that depicts the wide diversities tolerated by the First Amendment under one flag. See 2 S. Morison & H. Commager, The Growth of the American Republic, c. VIII (4th ed. 1950). Minorities in our midst who are to serve actively in our public affairs should be chosen on talent and character alone, not on cultural orientation or leanings.

---

[14] Uncommon Controversy, Report Prepared for American Friends Service Committee 29–30 (1970).

I do know, coming as I do from Indian country in Washington, that many of the young Indians know little about Adam Smith or Karl Marx but are deeply imbued with the spirit and philosophy of Chief Robert B. Jim of the Yakimas, Chief Seattle of the Muckleshoots, and Chief Joseph of the Nez Perce which offer competitive attitudes towards life, fellow man, and nature.[15]

I do not know the extent to which blacks in this country are imbued with ideas of African Socialism.[16] Leopold Senghor and Sékou Touré, the most articulate of African leaders, have held that modern African political philosophy is not oriented either to Marxism or to capitalism.[17] How far the reintroduction into educational curricula of ancient African art and history has reached the minds of young Afro-Americans I do not know. But at least as respects Indians, blacks, and Chicanos—as well as those from Asian cultures—I think a separate classification of these applicants is warranted, lest race be a subtle force in eliminating minority members because of cultural differences.

Insofar as LSAT's reflect the dimensions and orientation of the Organization Man they do a disservice to minorities. I personally know that admissions tests were once used to eliminate Jews. How many other minorities they aim at I do not know. My reaction is that the presence of an LSAT is sufficient warrant for a school to put racial minorities into a separate class in order better to probe their capacities and potentials.

The merits of the present controversy cannot in my view be resolved on this record. A trial would

---

[15] See C. Fee, Chief Joseph, The Biography of a Great Indian (1936).

[16] See. F. Brockway, African Socialism (1963); African Socialism W. Friedland & C. Rosberg ed. 1964).

[17] See L. Senghor, On African Socialism (M. Cook ed. 1964).

involve the disclosure of hidden prejudices, if any, against certain minorities and the manner in which substitute measurements of one's talents and character were employed in the conventional tests. I could agree with the majority of the Washington Supreme Court only if, on the record, it could be said that the Law School's selection was racially neutral. The case, in my view, should be remanded for a new trial to consider, *inter alia,* whether the established LSAT's should be eliminated so far as racial minorities are concerned.

This does not mean that a separate LSAT must be designed for minority racial groups, although that might be a possibility. The reason for the separate treatment of minorities as a class is to make more certain that racial factors do not militate *against an applicant or on his behalf.*[18]

There is no constitutional right for any race to be preferred. The years of slavery did more than retard the progress of blacks. Even a greater wrong was done the whites by creating arrogance instead of humility and by encouraging the growth of the fiction of a superior race.

---

[18] We are not faced here with a situation where barriers are overtly or covertly put in the path of members of one racial group which are not required by others. There was also no showing that the purpose of the school's policy was to eliminate arbitrary and irrelevant barriers to entry by certain racial groups into the legal profession groups. *Griggs* v. *Duke Power Co.,* 401 U. S. 424. In *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 16, we stated that as a matter of educational policy school authorities could, within their broad discretion, specify that each school within its district have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole, in order to disestablish a dual school system. But there is a crucial difference between the policy suggested in *Swann* and that under consideration here: the *Swann* policy would impinge on no person's constitutional rights, because no one would be excluded from a public school and no one has a right to attend a segregated public school.

There is no superior person by constitutional standards. A DeFunis who is white is entitled to no advantage by reason of that fact; nor is he subject to any disability, no matter what his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner.

The slate is not entirely clean. First, we have held that pro rata representation of the races is not required either on juries, see *Cassell* v. *Texas*, 339 U. S. 282, 286–287, or in public schools; *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 24. Moreover, in *Hughes* v. *Superior Court*, 339 U. S. 460, we reviewed the contempt convictions of pickets who sought by their demonstration to force an employer to prefer Negroes to whites in his hiring of clerks, in order to ensure that 50% of the employees were Negro. In finding that California could constitutionally enjoin the picketing there involved we quoted from the opinion of the California Supreme Court, which noted that the pickets would " 'make the right to work for Lucky dependent not on fitness for the work nor on an equal right of all, regardless of race, to compete in an open market, but, rather, on membership in a particular race. If petitioners were upheld in their demand then other races, white, yellow, brown and red. would have equal rights to demand discriminatory hiring on a racial basis.' " *Id.*, at 463–464. We then noted that

> "[t]o deny to California the right to ban picketing in the circumstances of this case would mean that there could be no prohibition of the pressure of picketing to secure proportional employment on ancestral grounds of Hungarians in Cleveland, of Poles in Buffalo, of Germans in Milwaukee, of Portuguese in New Bedford, of Mexicans in San Antonio, of the

numerous minority groups in New York, and so on through the whole gamut of racial and religious concentrations in various cities." *Id.*, at 464.

The reservation of a proportion of the law school class for members of selected minority groups is fraught with similar dangers, for one must immediately determine which groups are to receive such favored treatment and which are to be excluded, the proportions of the class that are to be allocated to each, and even the criteria by which to determine whether an individual is a member of a favored group. There is no assurance that a common agreement can be reached, and first the schools, and then the courts, will be buffeted with the competing claims. The University of Washington included Filipinos, but excluded Chinese and Japanese; another school may limit its program to blacks, or to blacks and Chicanos. Once the Court sanctioned racial preferences such as these, it could not then wash its hands of the matter, leaving it entirely in the discretion of the school, for then we would have effectively overruled *Sweatt* v. *Painter*, 339 U. S. 629, and allowed imposition of a "zero" allocation.[19] But what standard is the Court to apply when a rejected applicant of Japanese ancestry brings suit to require the University of Washington to extend the same privileges to his group? The Committee might conclude that the population of Washington is now 2% Japanese, and that Japanese also constitute 2% of the

---

[19] *Sweatt* held that a State could not justify denying a black admission to its regular law school by creating a new law school for blacks. We held that the new law school did not meet the requirements of "equality" set forth in *Plessy* v. *Ferguson*, 163 U. S. 537.

The student, we said was entitled to "legal education equivalent to that offered by the State to students of other races. Such education is not available to him in a separate law school as offered by the State." 339 U. S., at 635.

Bar, but that had they not been handicapped by a history of discrimination, Japanese would now constitute 5% of the Bar, or 20%. Or, alternatively, the Court could attempt to assess how grievously each group has suffered from discrimination, and allocate proportions accordingly; if that were the standard the current University of Washington policy would almost surely fall, for there is no Western State which can claim that it has always treated Japanese and Chinese in a fair and evenhanded manner. See, *e. g.*, *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Terrace* v. *Thompson*, 263 U. S. 197; *Oyama* v. *California*, 332 U. S. 633. This Court has not sustained a racial classification since the wartime cases of *Korematsu* v. *United States*, 323 U. S. 214, and *Hirabayashi* v. *United States*, 320 U. S. 81, involving curfews and relocations imposed upon Japanese-Americans.[20]

---

[20] Those cases involved an exercise of the war power, a great leveler of other rights. Our Navy was sunk at Pearl Harbor and no one knew where the Japanese fleet was. We were advised on oral argument that if the Japanese landed troops on our west coast nothing could stop them west of the Rockies. The military judgment was that, to aid in the prospective defense of the west coast, the enclaves of Americans of Japanese ancestry should be moved inland, lest the invaders by donning civilian clothes would wreak even more serious havoc on our western ports. The decisions were extreme and went to the verge of wartime power; and they have been severely criticized. It is, however, easy in retrospect to denounce what was done, as there actually was no attempted Japanese invasion of our country. While our Joint Chiefs of Staff were worrying about Japanese soldiers landing on the west coast, they actually were landing in Burma and at Kota Bharu in Malaya. But those making plans for defense of the Nation had no such knowledge and were planning for the worst. Moreover, the day we decided *Korematsu* we also decided *Ex parte Endo*, 323 U. S. 283, holding that while evacuation of the Americans of Japanese ancestry was allowable under extreme war conditions, their detention after evacuation was not. We said:

"A citizen who is concededly loyal presents no problem of espio-

Nor obviously will the problem be solved if next year the Law School included only Japanese and Chinese, for then Norwegians and Swedes, Poles and Italians, Puerto Ricans and Hungarians, and all other groups which form this diverse Nation would have just complaints.

The key to the problem is consideration of such applications *in a racially neutral way.* Abolition of the LSAT would be a start. The invention of substitute tests might be made to get a measure of an applicant's cultural background, perception, ability to analyze, and his or her relation to groups. They are highly subjective, but unlike the LSAT they are not concealed, but in the open. A law school is not bound by any legal principle to admit students by mechanical criteria which are insensitive to the potential of such an applicant which may be realized in a more hospitable environment. It will be necessary under such an approach to put more effort into assessing each individual than is required when LSAT scores and undergraduate grades dominate the selection process. Interviews with the applicant and others who know him is a time-honored test. Some schools currently run summer programs in which potential students who likely would be bypassed under conventional admissions criteria are given the opportunity to try their hand at law courses,[21] and certainly their performance in such programs could be weighed heavily. There is, moreover, no bar to considering an individual's prior achievements in

---

nage or sabotage. Loyalty is a matter of the heart and mind, not of race, creed, or color. He who is loyal is by definition not a spy or a saboteur. When the power to detain is derived from the power to protect the war effort against espionage and sabotage, detention which has no relationship to that objective is unauthorized." *Id.,* at 302.

[21] See n. 3, *supra.*

light of the racial discrimination that barred his way, as a factor in attempting to assess his true potential for a successful legal career. Nor is there any bar to considering on an individual basis, rather than according to racial classifications, the likelihood that a particular candidate will more likely employ his legal skills to service communities that are not now adequately represented than will competing candidates. Not every student benefited by such an expanded admissions program would fall into one of the four racial groups involved here, but it is no drawback that other deserving applicants will also get an opportunity they would otherwise have been denied. Certainly such a program would substantially fulfill the Law School's interest in giving a more diverse group access to the legal profession. Such a program might be less convenient administratively than simply sorting students by race, but we have never held administrative convenience to justify racial discrimination.

The argument is that a "compelling" state interest can easily justify the racial discrimination that is practiced here. To many, "compelling" would give members of one race even more than *pro rata* representation. The public payrolls might then be deluged say with Chicanos because they are as a group the poorest of the poor and need work more than others, leaving desperately poor individual blacks and whites without employment. By the same token large quotas of blacks or browns could be added to the Bar, waiving examinations required of other groups, so that it would be better racially balanced.[22]

---

[22] In *Johnson* v. *Committee on Examinations,* 407 U. S. 915, we denied certiorari in a case presenting a similar issue. There the petitioner claimed that the bar examiners reconsidered the papers submitted by failing minority applicants whose scores were close to the cutoff point, with the result that some minority appli-

The State, however, may not proceed by racial classification to force strict population equivalencies for every group in every occupation, overriding individual preferences. The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized. The purpose of the University of Washington cannot be to produce black lawyers for blacks, Polish lawyers for Poles, Jewish lawyers for Jews, Irish lawyers for Irish. It should be to produce good lawyers for Americans and not to place First Amendment barriers against anyone.[23] That is the point at the heart of all our

---

cants were admitted to the Bar although they initially had examination scores lower than those of white applicants who failed.

As the Arizona Supreme Court denied Johnson admission summarily, in an original proceeding, there were no judicial findings either sustaining or rejecting his factual claims of racial bias, putting the case in an awkward posture for review here. Johnson subsequently brought a civil rights action in Federal District Court, seeking both damages and injunctive relief. The District Court dismissed the action and the Court of Appeals affirmed, holding that the lower federal courts did not have jurisdiction to review the decisions of the Arizona Supreme Court on admissions to the state Bar. Johnson then sought review here and we denied his motion for leave to file a petition for mandamus, prohibition and/or certiorari on February 19, 1974. *Johnson* v. *Wilmer*, 415 U. S. 911. Thus in the entire history of the case no court had ever actually sustained Johnson's factual contentions concerning racial bias in the bar examiners' procedures. *DeFunis* thus appears to be the first case here squarely presenting the problem.

[23] Underlying all cultural background tests are potential ideological issues that have plagued bar associations and the courts. *In re Summers,* 325 U. S. 561, involved the denial of the practice of law to a man who could not conscientiously bear arms. The vote against him was five to four. *Konigsberg* v. *State Bar,* 353 U. S. 252, followed, after remand, by *Konigsberg* v. *State Bar,* 366 U. S. 36, resulted in barring one from admission to a state bar because of his refusal to answer questions concerning Communist Party member-

school desegregation cases, from *Brown* v. *Board of Education*, 347 U. S. 483, through *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1. A segregated admissions process creates suggestions of stigma and caste no less than a segregated classroom, and in the end it may produce that result despite its contrary intentions. One other assumption must be clearly disapproved: that blacks or browns cannot make it on their individual merit. That is a stamp of inferiority that a State is not permitted to place on any lawyer.

If discrimination based on race is constitutionally permissible when those who hold the reins can come up with "compelling" reasons to justify it, then constitutional guarantees acquire an accordionlike quality. Speech is closely brigaded with action when it triggers a fight, *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, as shouting "fire" in a crowded theater triggers a riot. It may well be that racial strains, racial susceptibility to certain diseases, racial sensitiveness to environmental conditions that other races do not experience, may in an extreme situation justify differences in racial treatment that no fairminded person would call "invidious" discrimination. Mental ability is not in that category. All races can compete fairly at all professional levels. So

---

ship. He, too, was excluded five to four. The petitioner in *Schware* v. *Board of Bar Examiners*, 353 U. S. 232, was, however, admitted to practice even though he had about 10 years earlier been a member of the Communist Party. But *In re Anastaplo*, 366 U. S. 82, a five-to-four decision, barred a man from admission to a state bar not because he invoked the Fifth Amendment when asked about membership in the Communist Party, but because he asserted that the First and Fourteenth Amendments protected him from that inquiry. *Baird* v. *State Bar of Arizona*, 401 U. S. 1, held by a divided vote that a person could not be kept out of the state bar for refusing to answer whether he had ever been a member of the Communist Party; and see *In re Stolar*, 401 U. S. 23.

344

far as race is concerned, any state-sponsored preference to one race over another in that competition is in my view "invidious" and violative of the Equal Protection Clause.

The problem tendered by this case is important and crucial to the operation of our constitutional system; and educators must be given leeway. It may well be that a whole congeries of applicants in the marginal group defy known methods of selection. Conceivably, an admissions committee might conclude that a selection by lot of, say, the last 20 seats is the only fair solution. Courts are not educators; their expertise is limited; and our task ends with the inquiry whether, judged by the main purpose of the Equal Protection Clause—the protection against racial discrimination [24]—there has been an "invidious" discrimination.

We would have a different case if the suit were one to displace the applicant who was chosen in lieu of DeFunis. What the record would show concerning his potentials would have to be considered and weighed. The educational decision, provided proper guidelines were used, would reflect an expertise that courts should honor. The problem is not tendered here because the physical facilities were apparently adequate to take DeFunis in addition to the others. My view is only that I cannot say by the tests used and applied he was invidiously discriminated against because of his race.

I cannot conclude that the admissions procedure of the Law School of the University of Washington that excluded DeFunis is violative of the Equal Protection Clause of the Fourteenth Amendment. The judgment of the Washington Supreme Court should be vacated and the case remanded for a new trial.

---

[24] See *Slaughter House Cases,* 16 Wall. 36, 81.

APPENDIX TO OPINION OF DOUGLAS, J.,
DISSENTING.

The following are excerpts from the Law School's
current admissions policy, as provided to the Court by
counsel for the respondents.

## ADMISSIONS

A. Policy Statement Regarding Admission to Entering
Classes of Juris Doctor Program—Adopted by the Law
Faculty December 4, 1973.

§ 1. The objectives of the admissions program are to
select and admit those applicants who have the best
prospect of high quality academic work at the law school
and, in the minority admissions program described below,
the further objective there stated.

§ 2. In measuring academic potential the law school
relies primarily on the undergraduate grade-point aver-
age and the performance on the Law School Admission
Test (LSAT). The weighting of these two indicators
is determined statistically by reference to past experi-
ence at this school. For most applicants the resulting
applicant ranking is the most nearly accurate of all
available measures of relative academic potential. In
truly exceptional cases, i. e., those in which the numeri-
cal indicators clearly appear to be an inaccurate measure
of academic potential, the admission decision indicated
by them alone may be altered by a consideration of the
factors listed below. The number of these truly excep-
tional cases in any particular year should fall somewhere
from zero to approximately forty. These factors are
used, however, only as an aid in assessing the applicant's
academic potential in its totality, without undue em-
phasis or reliance upon one or a few and without an
attempt to quantify in advance the strength of their

application, singly· or as a whole, in a particular case. They are:

a) the difficulty or ease of the undergraduate curriculum track pursued;

b) the demanding or non-demanding quality of the undergraduate school or department;

c) the attainment of an advanced degree, the nature thereof, and difficulty or ease of its attainment;

d) the applicant's pursuits subsequent to attainment of the undergraduate degree and the degree of success therein, as bearing on the applicant's academic potential;

e) the possibility that an applicant many years away from academic work may do less well on the LSAT than his or her counterpart presently or recently in academic work;

f) substantial change in mental or physical health that indicates prospect for either higher or lower quality of academic work;

g) substantial change in economic pressures or other circumstances that indicates prospect for either higher or lower quality of academic work;

h) exceptionally good or bad performance upon the writing test ingredient of the LSAT, if the current year's weighting of the numerical indicators does not otherwise take the writing score into account;

i) the quality and strength of recommendations bearing upon the applicant's academic potential;

j) objective indicators of motivation to succeed at the academic study of law;

k) variations in the level of academic achievement over time; and

l) any other indicators that serve the objective stated above.

§ 6. Because certain ethnic groups in our society

have historically been limited in their access to the legal profession and because the resulting underrepresentation can affect the quality of legal services available to members of such groups, as well as limit their opportunity for full participation in the governance of our communities, the faculty recognizes a special obligation in its admissions policy to contribute to the solution of the problem.

Qualified minority applicants are therefore admitted under the minority admissions program in such number that the entering class will have a reasonable proportion of minority persons, in view of the obligation stated above and of the overall objective of the law school to provide legal education for qualified persons generally. For the purpose of determining the number to be specially admitted under the program, and not as a ceiling on minority admissions generally, the faculty currently believes that approximately 15 to 20 percent is such a reasonable proportion if there are sufficient qualified applicants available. Under the minority admissions program, admission is offered to those applicants who have a reasonable prospect of academic success at the law school, determined in each case by considering the numerical indicators along with the listed factors in Section 2, above, but without regard to the restriction upon number contained in that section.

No particular internal percentage or proportion among various minority groups in the entering class is specified; rather, the law school strives for a reasonable internal balance given the particular makeup of each year's applicant population.

As to some or all ethnic groups within the scope of the minority admissions program, it may be appropriate to give a preference in some degree to residents of the state; that determination is made each year in view of

all the particulars of that year's situation, and the preference is given when necessary to meet some substantial local need for minority representation.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL concur, dissenting.

I respectfully dissent. Many weeks of the school term remain, and petitioner may not receive his degree despite respondents' assurances that petitioner will be allowed to complete this term's schooling regardless of our decision. Any number of unexpected events—illness, economic necessity, even academic failure—might prevent his graduation at the end of the term. Were that misfortune to befall, and were petitioner required to register for yet another term, the prospect that he would again face the hurdle of the admissions policy is real, not fanciful; for respondents warn that "Mr. DeFunis would have to take some appropriate action to request continued admission for the remainder of his law school education, and *some discretionary action by the University on such request would have to be taken.*" Respondents' Memorandum on the Question of Mootness 3–4 (emphasis supplied). Thus, respondents' assurances have not dissipated the possibility that petitioner might once again have to run the gantlet of the University's allegedly unlawful admissions policy. The Court therefore proceeds on an erroneous premise in resting its mootness holding on a supposed inability to render any judgment that may affect one way or the other petitioner's completion of his law studies. For surely if we were to reverse the Washington Supreme Court, we could insure that, if for some reason petitioner did not graduate this spring, he would be entitled to re-enrollment at a later time on the same basis as others who have not faced the hurdle of the University's allegedly unlawful admissions policy.

In these circumstances, and because the University's position implies no concession that its admissions policy is unlawful, this controversy falls squarely within the Court's long line of decisions holding that the "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case." *United States* v. *Phosphate Export Assn.*, 393 U. S. 199, 203 (1968); see *Gray* v. *Sanders,* 372 U. S. 368 (1963); *United States* v. *W. T. Grant Co.,* 345 U. S. 629 (1953); *Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37 (1944); *FTC* v. *Goodyear Tire & Rubber Co.,* 304 U. S. 257 (1938); *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290 (1897). Since respondents' voluntary representation to this Court is only that they will permit petitioner to complete this term's studies, respondents have not borne the "heavy burden," *United States* v. *Phosphate Export Assn., supra,* at 203, of demonstrating that there was not even a "mere possibility" that petitioner would once again be subject to the challenged admissions policy. *United States* v. *W. T. Grant Co., supra,* at 633. On the contrary, respondents have positioned themselves so as to be "free to return to [their] old ways." *Id.,* at 632.

I can thus find no justification for the Court's straining to rid itself of this dispute. While we must be vigilant to require that litigants maintain a personal stake in the outcome of a controversy to assure that "the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution," *Flast* v. *Cohen,* 392 U. S. 83, 106 (1968), there is no want of an adversary contest in this case. Indeed, the Court concedes that, if petitioner has lost his stake in this controversy, he did so only when he

350

registered for the spring term. But petitioner took that action only after the case had been fully litigated in the state courts, briefs had been filed in this Court, and oral argument had been heard. The case is thus ripe for decision on a fully developed factual record with sharply defined and fully canvassed legal issues. Cf. *Sibron* v. *New York*, 392 U. S. 40, 57 (1968).

Moreover, in endeavoring to dispose of this case as moot, the Court clearly disserves the public interest. The constitutional issues which are avoided today concern vast numbers of people, organizations, and colleges and universities, as evidenced by the filing of twenty-six *amicus curiae* briefs. Few constitutional questions in recent history have stirred as much debate, and they will not disappear. They must inevitably return to the federal courts and ultimately again to this Court. Cf. *Richardson* v. *Wright,* 405 U. S. 208, 212 (1972) (dissenting opinion). Because avoidance of repetitious litigation serves the public interest, that inevitability counsels against mootness determinations, as here, not compelled by the record. Cf. *United States* v. *W. T. Grant Co., supra,* at 632; *Parker* v. *Ellis,* 362 U. S. 574, 594 (1960) (dissenting opinion). Although the Court should, of course, avoid unnecessary decisions of constitutional questions, we should not transform principles of avoidance of constitutional decisions into devices for sidestepping resolution of difficult cases. Cf. *Cohens* v. *Virginia,* 6 Wheat. 264, 404–405 (1821) (Marshall, C. J.).

On what appears in this case, I would find that there is an extant controversy and decide the merits of the very important constitutional questions presented.