GOLDEN HOLIDAY TOURS et al., Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent.

No. 74–1962.

United States Court of Appeals, District of Columbia Circuit.

Argued 3 Nov. 1975.

Decided 3 March 1976.

Herbert A. Rosenthal, Jr., Washington, D. C., with whom Robert M. Hausman, Stephen D. Potts and Richard J. Kendall, Washington, D. C., were on the brief for petitioners.

Jay L. Witkin, Atty., C. A. B., Thomas J. Heye, Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Re-

search, C. A. B. and Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondent.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This action comes before the court on petition for review of a Civil Aeronautics Board rejection[1] of an amendment to an Inclusive Tour Prospectus. Petitioners are the inclusive tour operator, Golden Holiday Tours, and the supplemental air carrier party to the amendment contracts, Overseas National Airways. The amendment, filed jointly by petitioners, would have made available approximately 179 seats on flights from Paris to Los Angeles on 1 and 2 September 1974. The initial letter of 7 August stated the subject matter of the amendment as the substitution of a 350-seat DC-10 for a 250-seat DC-8 on 1 September, and the addition of 79 seats on a split charter DC-8 on 2 September.[2]

The Board refused to accept the amendment for filing, however, on the ground that it was in violation of 14 C.F.R. § 378.-10(b),[3] which postpones effectiveness of amendments for 15 days after filing. The Board concluded that because Golden Holiday had sold tour tickets utilizing the additional space prior to the lapse of 15 days, in fact prior to filing at all, it had committed a "serious transgression" of the regulations, justifying outright rejection of the filing.[4] The space contracted for was thereby rendered unavailable to Golden Holiday, which was obliged to arrange for additional return transportation on regularly scheduled carriers for approximately 150 passengers, at great additional cost to itself[5] and some alleged inconvenience to the passengers.

1. The amendment was initially submitted for filing by a letter dated 7 August 1974. It was rejected in a letter from the Director of the Bureau of Operating Rights, dated 13 August 1974. Petitioners sought Board review of the staff action, and on 16 August 1974 the Board granted the petition for review and affirmed the staff action. Petitioners' 22 August 1974 request for reconsideration of the Board's action was granted by letter of 6 September 1974, but the rejection of the filing was again affirmed.

2. We can not ascertain whether this initial statement was correct when made. However, it appears that the final agreement between petitioners did not involve a switch of planes on 1 September, but only an agreement to charter all rather than two-thirds of a contracted-for DC-10.

3. 14 C.F.R. § 378.10(b) (effective 19 July 1974).
No change in the facts reflected in a filed Prospectus shall become effective until at least 15 days after the tour operator or foreign tour operator and the direct air carrier have jointly filed with the Board (Supplementary Services Division, Bureau of Operating Rights), in duplicate, an amended Prospectus reflecting such change, unless he has been notified by the Board that such change may become effective sooner: *Provided, however,* That if during the 15-day period following filing of an amended Prospectus hereunder, the tour operator or foreign tour operator has been notified that the Board has rejected such amended Prospectus for noncompliance with this part, then such change shall not become effective until he has subsequently been notified by the Board that such filing has been accepted; and *Provided further,* That the direct air carrier need not join in the filing of an amended Prospectus which reflects only such change or changes as do not involve air transportation or services in connection therewith which are to be provided by such direct air carrier. Deviations from the Prospectus may not be made except where they are beyond the control of the carrier or the operator, and there is insufficient time to file an amended Prospectus.

4. *See* Letter of 16 August 1974, from Edwin Z. Holland to Herbert A. Rosenthal, *App.* at 16–17.

5. In its letter of 15 August 1974, Golden Holiday estimates the total financial impact of the Board's decision to be $122,760.00 (*App.* at 15). It is unclear from the letter how that figure was arrived at, and we are not persuaded that it represents the true economic loss to Golden Holiday. It appears that the damages can be roughly reckoned by multiplying the number of persons stranded times the price of a one-way commercial ticket. At the present rate of $577.00 for a one-way, peak season Paris to Los Angeles ticket, and assuming 150 passengers, the total additional cost would be $86,-550.00. We offer this only to indicate the magnitude of the injury.

Petitioners make no request for either damages[6] or any sort of injunctive relief. Since the subject acts of this controversy are all in the past, no injunction could be framed to give relief from the alleged breach of discretion. Rather the remedy sought is in the nature of a declaration that the action taken was wrongful, in hopes that that will deter similar acts in the future. As an appeal of a CAB order, this appears to be an action over which we have jurisdiction under the Federal Aviation Act.[7] However, in view of the nature of relief sought, a question arises whether the case is moot, and thus fails to satisfy the case or controversy prerequisite to federal jurisdiction.

Nothing this court can do now could provide any effective remedy for the particular injuries alleged. However, like all those in the inclusive tour business, petitioners have occasion to amend their tour prospectus on a regular and frequent basis. During the tour season culminating in the problem involved here, eighteen amendments to the Golden Holiday prospectus were submitted between 17 April and 2 August 1974.[8] It is not implausible that petitioners will again run afoul of the Board's construction of the rule postponing amendment effectiveness for 15 days after filing. Further, the essence of the alleged violation is the failure to file sufficiently in advance of any marketing or other activities relating to the affected flights. It follows that such controversies will commonly involve little time between the disputed filings and the scheduled flights to which they pertain, so that opportunity for full judicial review of the live issue will be chronically lacking. We therefore conclude that this case falls squarely within the mootness exception, enunciated by the Supreme Court, for controversies "capable of repetition, yet evading review." [9]

The issue presented concerns the extent of Civil Aeronautics Board discretion to reject filings under § 378.10(b) of its regulations. That section sets forth the requirement of a 15 day waiting period between filing and effectiveness of amendments, and presupposes a power in the Board to reject filed amendments.[10] The rule does not, however, set forth the conditions under which such rejection is appropriate.[11] We are therefore left to infer appropriate limitations from the context and ostensible purposes of the rule.

One seemingly clearcut basis for rejecting a filing is the failure of the documents to meet the technical requirements set forth in 14 C.F.R. §§ 378.13–17. These provisions describe what the Prospectus must contain and, to some degree, determine the form that it should take. A prospectus, including any amendments thereto, which does not satisfy these basic requirements of content and form, is facially inadequate and subject to rejection on that basis. There is no assertion here, however, that the documents are inadequate on their face. If a proper power of rejection has been exercised in this case, it must reside in some more substantial regulatory purpose.

---

6. It seems clear that damages would be barred under the discretionary activities exception to the Federal Tort Claims Act. 28 U.S.C. § 2680(a) (1970).

7. 49 U.S.C. § 1486(a) (1970).

8. Prospectus IT 73–154, Annex. 6.

9. *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147, 161 (1973); *Southern Pac. Term. Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911). *See also DeFunis v. Odegaard*, 416 U.S. 312, 318–19, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164, 169 (1974).

10. *See* note 3 *supra*.

11. The rule refers to rejection "for noncompliance with this part," meaning part 378. However, it is clearly not intended that a violation of any section of the part dealing with inclusive tours will be met by rejection of the prospectus or amendment, since other remedies are also provided for. Under § 378.6, the Board retains power to protect the rights of the travelling public by summarily suspending an operator's exemption from certain provisions of the Federal Aviation Act. *See* 14 C.F.R. § 378.3 (1974). Provisions for enforcement in less urgent cases of public necessity are set out in 14 C.F.R. § 378.31 (1974) and 49 U.S.C. §§ 1471, 1472, 1482 (1970). They involve both civil and criminal penalties.

The rule whose violation is the asserted basis for the Board's action became effective on 19 July 1974, 18 days before filing of the amendment at issue in this case. Previously the rule required filing of amendments no later than 5 days *after* the subject change had been made, thus allowing for implementation of changed plans without any prior scrutiny by the Board.[12] The Notice of Proposed Rulemaking[13] and the explanation accompanying the promulgation of the rule[14] do not unambiguously set forth the purposes behind the rule change. However both documents do indicate that a primary aim of the new rule was to facilitate meaningful Board review of proposed changes, in order to protect travellers from inadequate provisions on their behalf.[15] To a great extent, the Board apparently was striving to enhance its ability to protect travellers against incautious or unscrupulous tour operators.

If such protection for the travelling public is taken as the underlying rationale of the new rule, it is sensible to allow the Board to reject filings wherever such action appears, on balance, to serve that purpose. We conclude, however, that the decision to reject petitioners' filing, and thus render unavailable return seating capacity set aside for 150 Americans in Europe, can not meet this test.

On 13 August, when the filing was initially rejected, and indeed when the amendment letter was filed on 7 August, the seating capacity that was the subject of the amendment had been formally contracted for.[16] In terms of protecting the particular tour participants, the Board, at that time, had no reason whatever to believe that the safe return of any traveller was in jeopardy. The only way in which the order can be seen to serve a traveller-protection purpose is by its *in terrorem* effect; rejection of all proposed additions of capacity wherever tickets were sold before a filing became effective would certainly discourage such conduct in the future.

It is apparent, however, that such an attempt to use the rejection power as a lever to compel compliance,[17] and thus achieve the longterm goal of traveller protection, is self-defeating at the most basic level. For by rejecting the filing outright, the Board in this case denied a substantial number of travellers the very security which its policy ostensibly seeks to achieve. The result was to cast them, on short notice, to the uncertain fate of finding space on scheduled airlines during the Labor Day

---

**12.** 14 C.F.R. § 378.10(b) (effective 8 May 1971, superseded 19 July 1974).

In the event of any change in the facts as reflected in the Prospectus, an amended Prospectus shall be filed no later than five (5) days following such change. Deviations from the Tour Prospectus, or the amended Prospectus, may not be made except where they are compelled by circumstances beyond the control of the carrier or tour operator and there is insufficient time to file an amended Prospectus.

**13.** *Notice of Proposed Rulemaking,* CAB Docket No. 26049, 38 Fed.Reg. 30281 (1973).

**14.** *Adoption of a Waiting Period for Marketing Inclusive Tour Charters,* Amendment No. 9 to Part 378, 39 Fed.Reg. 21124 (1974).

**15.** The Notice of Proposed Rulemaking indicates that the change is desirable "for the protection of the public as well as for administrative efficiency." 38 Fed.Reg. at 30281. The comments accompanying the rule itself are a bit more explicit. The 15 day waiting period is there seen "as a desirable technique to improve our staff's ability to supervise effectively the marketing of these types of charters, thereby increasing the protection of the travelling public." 39 Fed.Reg. at 21125.

**16.** Petitioners indicated on 15 August 1974 that oral agreement was reached as to 79 of the 179 seats on 8 July 1974, and that a formal contract was executed on 1 August. Letter of 15 August 1974, from Herbert A. Rosenthal to the CAB, at 2. (*App.* at 14). It is unclear from the record whether the additional 100 seats were also contracted for at this time. In any event, it seems safe to assume that a contract was signed before 7 August, since that was the date of filing, and no allegation has been made that all contracts were not filed as required at that time.

**17.** We are not unaware of petitioners' arguments that the imposition of sanctions without notice and hearing is contrary to the Administrative Procedure Act and the due process clause. Since we are able to dispose of the case on other grounds, we express no view on either of these theories.

peak travel season.[18] Inasmuch as the Board's action *only* prevented the addition of *westbound* capacity and did *not* affect the amount of *eastbound* space, the prospect for actual inconvenience to travellers increased as affected tour participants departed for Europe, while the controversy moved through the agency appeal process. In the situation as it developed, the Board appears to us to have acted in a manner all but oblivious to the interests of the travellers involved.

The prospectus on file with the Board put it on notice that Golden Holiday operates 16, 23, and 30 day tours. It follows that persons scheduled to return on the controverted flights would be leaving for Europe on 3, 10 or 17 August. We do not suggest that a decision by the Board to order cancellation of eastbound space on 10 or 17 August would have made justifiable their refusal to allow the addition of westbound space. However, it does appear that the Board's repeated refusals to entertain the amendment without reference or inquiry as to the substantial groups of travellers leaving for Europe on 10 or 17 August,[19] belies any claim to primary concern for the fate of these passengers. Especially in view of the regular enforcement procedures [20] available to discourage future violations of the rule, we find the order unsupported by any ostensible purpose to protect the travelling public.

Apart from the traveller-protection purpose that the rule was ostensibly adopted to serve, one other statutory goal which the Board apparently did not consider, and which was clearly impaired by the action it took, is the "encouragement and development" of domestically-based air transportation.[21] The rejection of the amendments forced Golden Holiday to purchase space on scheduled airlines, and one can reasonably assume (especially at this peak travel season) that a significant proportion of that space was on foreign flag carriers. Thus funds were channelled into the coffers of foreign aviation enterprises which, had the amendments been accepted, would have been available for domestic use.

Especially in view of the alternative civil and criminal enforcement remedies which the Board has at its disposal to discourage future violations of the rule,[22] it appears to

18. The record leaves unclear the availability of scheduled airline capacity on the dates in question. Petitioners alleged in their request for reconsideration of the Board's ruling, Letter of 22 August 1974, from Herbert A. Rosenthal to CAB, (*App.* at 18–19), that they had sought space from several European cities "to the United States," and had been told that no space was available. On reconsideration, in affirming its prior action, the Board directly contradicted this assertion and stated that "ample capacity" was available, "although some minor changes in travel plans may be required." Letter of 6 September 1974, from Edwin Z. Holland to Herbert A. Rosenthal, at 2 (*App.* at 25).

In their reply brief, petitioners attempt to explain the discrepancy of views by suggesting that the Board's inquiry had focused only on returning passengers to the continental United States, and not on getting them back to Los Angeles. *Petitioners' Reply Brief* at 21. The Board's counsel in oral argument was unable to either confirm or deny this assertion.

19. In the letter of 22 August 1974, seeking reconsideration of the Board's order, petitioners state the number of passengers scheduled to return to Los Angeles over Labor Day weekend as follows (*App.* at 21):

| Departure | Length of Tour | No. |
|---|---|---|
| 3 August | 4 weeks | 44 |
| 10 August | 3 weeks | 407 |
| 17 August | 2 weeks | 123 |

Until that time, it appears that the Board did not have information as to precisely how many participants scheduled to utilize the controverted space were leaving on which days. (Petitioners' letter of 15 August did indicate that a total of 150 travellers needed the extra space. *App.* at 13.) However, receipt of the proposed amendment on 7 August should have put the Board on notice that the secure return of some tour participants leaving on 10 August would be affected by their disposition, thus calling for a prompt response, or at least an inquiry as to the numbers and return status of persons leaving on that date. Instead the Board gave petitioners no indication whatever until it flatly rejected the amendment on 13 August, after the 10 August flight carrying the bulk of the overload passengers had departed.

20. *See* note 11 *supra.*

21. *See* 49 U.S.C. § 1302(a) (1970).

22. *See* note 11 *supra.*

us that the invocation of the rejection provision in this context not only failed to advance the purposes of the rule, but was a peculiarly harsh, unforeseeable, and arbitrary action. This becomes apparent upon a closer look at Petitioner's day-to-day operations, and the pattern of behavior established by the Board.

The Prospectus makes clear the very substantial complexity involved in arranging tours of the sort and on the scale offered by Golden Holiday in 1974. Theirs was an extensive program of 2, 3, and 4 week tours, constituting in all approximately 50 different tour packages. Each tour package was offered between 10 and 14 times during the season, which ran from April through October. Charter airline arrangements were initially made well in advance, on the basis of best estimates of customer demand. Flights were contracted for in blocks running at regular intervals between several departure points in the United States, and the various embarcation and disembarcation points in Europe.[23] Each flight was to carry participants in several tours, whose schedules were coordinated to maximize aircraft utilization.

We do not know the details of petitioner's sales practices. It is entirely possible that they have and continue sometimes to violate the provisions of § 378.10(b). Moreover, the very fact of the oversales [24] which gave rise to the present controversy makes clear that whatever those practices are, they are inadequate to prevent overbooking in all cases. However, especially in view of the apparent need to rely on independent travel agents in marketing petitioner's product,[25] the oversales at issue here do not remotely suggest that there has been any unscrupulousness or chronic disregard of traveller well-being. The scheduling difficulties endemic to the business make unreasonable any such inference. To the contrary, Golden Holiday asserts that it has never failed to make adequate provision for a single traveller,[26] and that assertion is nowhere contradicted.

A closer look at the scheduling practices of Golden Holiday and its affiliated companies confirms the nonegregious nature of any possible misconduct, at least from the perspective of traveller security. It has certainly not been guilty at anytime of entering into one-way charter contracts and attempting to sell tours, without making what plausibly appear to be adequate provisions for return service. In fact, *at all times relevant to this proceeding, there has actually been more westbound than eastbound capacity under contract.*[27] The need

---

**23.** For the 1974 season, Golden Holiday initially entered into 8 such block charter contracts, with petitioner ONA and Capitol Airlines. These primary contracts, as filed with the Board on 2 November 1973, were as follows:

| | |
|---|---|
| NY/Lon—Paris/NY | 252 seats |
| Weekly—1 June 1974—20 October 1974 (westbound begin and end 2 weeks after eastbound) | |
| NY/Lon —Paris/NY | 183 seats |
| Weekly –8 June 1974—29 September 1974 (2 week lag) | |
| NY/Paris—Lon/NY | 252 seats |
| Weekly --8 June 1974—29 September 1974 (2 week lag) | |
| NY/Lisbon—Lisbon/LA | 183 seats |
| Weekly—11 May 1974—13 October 1974 (2 week lag) | |
| LA/Lisbon—Lisbon/LA | 183 seats |
| Weekly --11 May 1974 —20 October 1974 (3 week lag) | |
| Miami/Chi/Lon—Paris/Chi/Miami | 250 seats |
| Irregular—4 May 1974—5 September 1974 (2 week lag) | |
| NY/Lon or Paris—Lon or Paris/NY | various capacities |
| Weekly—20 April 1974--20 October 1974 (3 week lag) | |
| LA/Lon—Paris/LA | various capacities |
| Weekly—20 April 1974—20 October 1974 (3 week lag) | |

**24.** Westbound only, because of passenger choice of return dates.

**25.** *See* Letter of 8 August 1974, from Herbert A. Rosenthal to CAB, at 1 (*App.* at 6).

**26.** *Id.*

**27.** It appears from the prospectus that Golden Holiday contracted for more capacity in both directions than it could reasonably expect to use. Some eastbound capacity was then cancelled, apparently by consolidating or cancelling tours before their departure dates. Many fewer westbound flights were cancelled, presumably because the arrangements would have to be made further in advance, before all tours utilizing the return flight have departed. The resulting schedule from 3 August 1974 to 2 September 1974, as best we can reconstruct it, is set out below:

for extra westbound space over the Labor Day weekend resulted from an unexpectedly large glut of travellers wishing to return at that time, which did not become apparent until ticket sales for the August tours were well advanced.

Perhaps in recognition of the substantial difficulties which inclusive tour operators face in the coordination of tour packages, scheduled flights, and ticket sales, the Board generally has been quite flexible in its treatment of amendment requests. Prior to the effectiveness of the new rule 378.10(b) on 19 July 1974, the Board regularly accepted amendments which would have contravened the new rule had it been in effect, and which may well have been in violation of the rule as it then existed.[28]

| | Eastbound | Capacity | | Westbound | |
|---|---|---|---|---|---|
| Aug. 3 | NY/Lon | 252 | 252 | Paris/NY | Aug. 4 |
| | NY/Paris | 252 | 183 | Paris/NY | |
| | NY/Lisbon | 183 | 252 | Lon/NY | |
| | NY/Paris | 345 | 183 | Lisbon/NY | |
| | LA/Lon | 345 | 183 | Lisbon/LA | |
| | LA/Lon | 180 | 250 | Paris/Chi/Miami | |
| | | 1557 | 345 | Lon/LA | |
| | | | 345 | Paris/LA | |
| | | | 180 | Paris/LA | |
| | | | 2173 | | |
| Aug. 10 | NY/Lon | 252 | 252 | Paris/NY | Aug. 11 |
| | NY/Paris | 252 | 183 | Paris/NY | |
| | NY/Lisbon | 183 | 252 | Lon/NY | |
| | LA/Lisbon | 183 | 183 | Lisbon/NY | |
| | NY/Paris | 345 | 183 | Lisbon/LA | |
| | LA/Lon | 345 | 250 | Paris/Chi/Miami | |
| | LA/Lon | 180 | 345 | Lon/NY | |
| | LA/Lisbon | 183 | 345 | Paris/LA | |
| | | 1923 | 180 | Paris/LA | |
| | | | 183 | Lisbon/LA | |
| | | | 2356 | | |
| Aug. 17 | NY/Lon | 252 | 252 | Paris/NY | Aug 18 |
| | NY/Paris | 252 | 183 | Paris/NY | |
| | NY/Lisbon | 183 | 252 | Lon/NY | |
| | LA/Lisbon | 183 | 183 | Lisbon/NY | |
| | NY/Paris | 250 | 183 | Lisbon/LA | |
| | LA/Lon | 345 | 250 | Paris/Chi/Miami | |
| | LA/Lon | 180 | 345 | Paris/NY | |
| | | 1645 | 345 | Paris/LA | |
| | | | 180 | Paris/LA | |
| | | | 2173 | | |
| Aug. 24 | NY/Lisbon | 183 | 252 | Paris/NY | Aug. 25 |
| | LA/Lisbon | 183 | 183 | Paris/NY | |
| | LA/Lon | 345 | 252 | Lon/NY | |
| | LA/Lon | 180 | 183 | Lisbon/NY | |
| | LA/Lisbon | 183 | 183 | Lisbon/LA | |
| | | 1074 | 345 | Lon/NY | |
| | | | 345 | Paris/LA | |
| | | | 180 | Paris/LA | |
| | | | 183 | Lisbon/LA | |
| | | | 2106 | | |
| Aug. 31 | NY/Lisbon | 183 | 252 | Paris/NY | Sept. 1 |
| | LA/Lisbon | 183 | 183 | Paris/NY | |
| | Miami/Chi/Lon | 250 | 252 | Lon/NY | |
| | NY/Paris | 345 | 183 | Lisbon/NY | |
| | LA/Lon | 180 | 183 | Lisbon/LA | |
| | LA/Lisbon | 183 | 345 | Paris/NY | |
| | LA/Lon | 183 | 180 | Paris/LA | |
| | Chi/Lon | 183 | 183 | Lisbon/LA | |
| | | 1690 | 183 | Paris/LA | |
| | | | 1944 | | |
| TOTAL | | 7889 | 10752 | | |

28. A number of flights were added to the Golden Holiday prospectus on such short notice that ticket sales almost certainly were made long before the expiration of three weeks after filing. In some instances flights were added only a matter of a few days before departure, in situations indicating that ticket sales were begun much more than 5 days earlier. Such instances appear to present violations of the old rule, requiring amendment no later than 5 days following a "change in the facts as reflected in the Prospectus." *See* note 13 *supra*.

The following schedule additions were accepted by the Board during the weeks before the rule change, without any apparent doubt or reservation:

1. Capitol Airlines Flight from Chicago to London on 13 July 1974. Contract filed 11 June 1974, bond filed 21 June 1974, 22 days before departure.

2. Eleven World Airways flights between 29 June 1974 and 27 October 1974, to replace flights which contractor ONA was unable to perform. Contract and bond filed 12 June 1974, 17 days before the first departure.

3. Pan American Airlines flight from Lisbon to Los Angeles on 20 July 1974, to replace cancelled Capitol Airlines flight. Notice of change submitted 16 July 1974, contract and bond filed 19 July 1974, 1 day before departure.

4. Capitol Airlines flight from Chicago to London on 21 July 1974, to replace cancelled ONA flight of 20 July 1974. Contract and bond filed 16 July 1974, 5 days before departure.

We recognize that the latter three amendments involved flights to replace cancelled flights for which previous filings had been made, and that in the present case no such antecedent flight had been either under contract or on file. The alacrity with which these amendments were accepted, especially the latter two, on 1 and 5 day notice respectively, is nonetheless indicative of a significant flexibility in the Board's approach to charter scheduling.

There is nothing in the Prospectus to indicate that acceptance in those cases was in any sense reluctant or qualified. Nor is there any indication in the record that the Board otherwise gave warning that, under the new rule, it might flatly reject amendments much like those which, weeks before, it had unhesitatingly found to be entirely proper.

Moreover, even in the context of Board actions taken after the effective date of the new rule, the rejection of petitioners' amendment appears peculiarly harsh and aberrational. Petitioners draw to our attention several instances of "irreversible non-compliance" with the new rule 378.10, where the Board accepted the filings subject to compromised enforcement settlements.[29] In all of these cases, operators had marketed tours prior to the effective date of their Prospectuses. In each instance the Board responded to the irreversible violation not by the flat rejection of the prospectus or any part thereof, but by settlements arrived at through regular enforcement proceeding channels.

This continued pattern of relatively flexible administrative dealing bolsters our conclusion that, in light of all the circumstances, the rejection of the amendment was essentially an arbitrary act. The extent of the resulting injury to petitioners, compared with the relatively technical nature of the alleged misconduct, and the Board's own historical recognition and allowance for the admitted difficulties facing charter operators, convince us that the action was a substantial over-response, especially where less extreme enforcement procedures were and are available.[30] The penalty of at least $86,000 is horrendous by comparison with penalties assessable by conventional enforcement means,[31] and, when coupled with the absence of any hearing on issues of guilt, mitigating circumstances, or damage actually suffered by any party, makes this a unique administrative agency proceeding which should not be repeated. The Order was an abuse of administrative discretion.

TAMM, Circuit Judge, dissents from the foregoing opinion.

---

We note also that the first amendment above, proposing the 13 July 1974 Chicago to London flight is much like the present amendment. Its acceptance without inquiry as to whether ticket sales had preceded the filing by more than 5 days, gives some reason to expect a similarly forgiving approach to acceptance of filings under the new rules.

**29.** *Petitioners' Reply Brief* at 29–52.

**30.** The Board's decision, after appropriate rulemaking proceedings, to adopt a uniform policy of rejecting late filed amendments would present a different case, on which we imply no opinion at this time.

**31.** The total injury to petitioners which appears to us to be in the vicinity of $86,000, *see* note 5

*supra*, seems to be far in excess of any sum likely to be assessed under the civil and criminal enforcement provisions of 49 U.S.C. §§ 1471, 1472 (1970). Those sections provide for maximum penalties of $1,000 and $2,000 respectively, per violation per day. Even if illicit ticket sales were carried on for a substantial number of days, it seems likely that the total assessment in an enforcement proceeding would be compromised at a figure far below the injury resulting from the outright rejection. In four subsequent enforcement proceedings for marketing tours prior to the Prospectus effective date, the civil penalties have been compromised at $1,000, $3,000, $11,675, and $12,300. *See Petitioners' Reply Brief* at 34, 39, 41 and 49.