Charles E. AUSTIN et al., Plaintiffs,

v.

Reginald WILKINSON
et al., Defendants.

No. 4:01–cv–0071.

United States District Court,
N.D. Ohio.

March 21, 2006.

Alice Lynd, Staughton Lynd, Law Office of Staughton & Alice Lynd, Niles, OH, Bill Goodman, New York, NY, Jeffrey M. Gamso, ACLU of Ohio Foundation, Michael J. Benza, Cleveland, OH, Jules L. Lobel, Pittsburgh, PA, Terry H. Gilbert, Friedman & Gilbert, Cleveland, OH, for Plaintiffs.

Jeffrey A. Stankunas, James Eric Holloway, Mark D. Landes, Isaac, Brant, Ledman & Teetor, Carol H. O'Brien, Charissa D. Payer, Joseph M. Mancini, Todd R. Marti, Office of the Attorney General, State of Ohio Corrections Litigation Section, Columbus, OH, Marianne Pressman, Office of the Attorney General, State of Ohio Corrections Litigation Section, Cincinnati, OH, Robert C. Angell, Robert C. Angell, LLC, Westerville, OH, Janet Hill Arbogast, Office of Atty. Gen., Columbus, OH, for Defendants.

## ORDER AND OPINION

GWIN, District Judge.

This Order and Opinion resolves two opposing motions currently pending in this case: (1) the Plaintiffs' motion for an Order extending jurisdiction of this Court over Due Process Issues for one year [Doc. 631] and (2) the Defendants' motion to terminate the prospective relief provided by this Court's February and March 2002 Orders [Doc. 631].

For the following reasons, the Court GRANTS the Plaintiffs' motion and DENIES the Defendants' motion. The Court further ORDERS the Defendants to implement several procedural modifications to its existing policy for the placement and retention of inmates at Ohio State Penitentiary ("OSP").

### I. Background

This prison litigation case began in 2001 when the Plaintiffs, inmates in Ohio's only super maximum security prison, sued Defendants Reginald Wilkinson *et al.* (hereinafter collectively referred to as "Ohio") under 42 U.S.C. § 1983. The Plaintiffs alleged that incarceration at OSP was an atypical and significant hardship when compared with the normal incidents of prison life. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Because of its atypical nature, the Plaintiffs argued that Ohio needed to afford them meaningful process before transferring them to OSP or retaining them at OSP.

After an eight-day bench trial, this Court held for the Plaintiffs, finding a liberty interest and ordering several substantive and procedural modifications. Ohio appealed. Upon appeal, the Sixth Circuit Court of Appeals partially affirmed and partially reversed. Ohio appealed and the Supreme Court granted certiorari. The Court affirmed this Court's finding that the conditions at OSP were an atypical and significant hardship and this Court's finding that Ohio must afford the Plaintiffs a hearing before transferring inmates to OSP or retaining inmates at OSP. However, the Court reversed this Court's Order relating to certain procedures that must be followed and remanded. Upon the parties' cross motions, this Court decides whether continuing jurisdiction is appropriate under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A) *et seq.*

## A. Facts

The Ohio State Penitentiary, Ohio's only super maximum security prison, opened in 1998. The Ohio legislature approved building the prison after a violent riot at the Lucasville Southern Ohio Correctional Facility in April 1993.

As this Court has made clear in earlier opinions, conditions at the OSP are much more restrictive than at other Ohio correctional facilities, including those housing inmates under administrative control.[1] OSP was designed specifically for security classification level 5 inmates, the so-called "worst of the worst." The conditions at OSP reflect Ohio's desire for different conditions than at other maximum security prisons. As the Supreme Court observed, "[i]ncarceration at OSP is synonymous with extreme isolation."

As described in earlier opinions and as recognized by the Court, the atypical con-

ditions at OSP create a liberty interest and an accompanying right to due process before placement or retention at OSP. *Wilkinson v. Austin,* 545 U.S. 209, 125 S.Ct. 2384, 2394–95, 162 L.Ed.2d 174 (2005) ("[W]e are satisfied that assignment to OSP imposes an atypical and significant hardship under any plausible baseline.... It follows that respondents have a liberty interest in avoiding assignment to OSP.")

## B. Procedural History

On January 9, 2001, the Plaintiffs filed a complaint seeking declaratory and injunctive relief. Specifically, the Plaintiffs alleged that Ohio's procedures for transferring them to and retaining them at OSP denied them Due Process.

## 1. The Old Policy

The original basis for this law suit was Ohio's placement and retention policy that was in place from 1999 until March 2002, Department of Rehabilitation and Correction Policy 111–07 (hereinafter the "Old Policy"). Before the Old Policy became effective in 1999, Ohio had no clear policy for determining which inmates it would assign to OSP. Without any transfer policy in place, the Department simply relied on wardens to choose inmates for transfer. As a result, many inmates were given no hearing before transfer to OSP. Moreover, Ohio often treated similarly situated inmates differently. (Davis Jan. 2002 Trial Tr. 126.)

On August 31, 1998, Ohio attempted to establish some placement predictability at the OSP by issuing the "Old Policy." The policy took effect on January 28, 1999, and described behavioral criteria that referral committees at Ohio's prisons should con-

---

1. Administrative control is highly restrictive solitary confinement. See Ohio Admin. Code § 5120–9–13 (2001). Inmates at vari-

ous Ohio institutions are placed in administrative control for, among other reasons, prison rule infractions.

sider before recommending an inmate for OSP.

### 2. The New Policy

In early January 2002, just before the bench trial in this matter was scheduled to begin, Ohio promulgated a revised policy for classifying inmates for assignment at OSP, Department of Rehabilitation and Correction Policy 111–07 (hereinafter the "New Policy"). The New Policy afforded significantly more procedural protection against erroneous assignments to OSP than the Old Policy had given.

Upon each inmate's entry into the prison system, Ohio assigns a security rating based on the risk each inmate poses. There are five levels of security classification, with level 1 representing the lowest security risk and level 5 representing the highest. As originally conceived, the OSP housed only level 5 inmates.

On February 25, 2002, this Court ruled that the New Policy failed to meet Due Process requirements. [Doc. 227.] On March 26, 2002, this Court ordered the parties to submit proposed policies that addressed the New Policy's constitutional shortcomings. [Doc. 272.] On April 24, 2002, Ohio filed its proposed Policy 111–07 pursuant to the March 26 Order. On May 13, 2002, the Court adopted the New Policy, with modifications (hereinafter the "Modified New Policy"), as the procedure by which Ohio was to transfer and retain inmates at OSP. [Doc. 284.] [2]

On June 13, 2005, the Supreme Court decided *Wilkinson v. Austin*, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). The Court upheld this Court and the Sixth Circuit's finding that placement in OSP created a liberty interest by imposing an "atypical and significant hardship." *Id.* at 2395. The Court overturned the lower courts' holding that the original New Policy provided the Plaintiffs inadequate Due Process. *Id.* at 2397–98. The Court remanded the case to this Court on August 16, 2005. The Court provides a discussion of the Supreme Court's holding below in Part III.B.2.

In August 2004, the parties agreed to a one year continuance of the Court's jurisdiction and the Court so ordered the continuance. [Doc. 484.]

### II. Legal Standard

The Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626 *et seq.*, governs the standard for continuation and termination of injunctive relief in prison litigation. *Id.* § 3626(b)(1). The Act provides that prospective relief will generally remain in effect no longer than two years unless the defendant moves to terminate the relief. *Id.* § 3626(b)(1). A Court may continue the prospective relief beyond two years if the Court finds that such relief "remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *Id.* § 3626(b)(1)(B)(3).

Ohio has moved to terminate the prospective relief. The Plaintiffs oppose the motion and have moved for a one-year continuation of the relief. Because Ohio

**2.** Ohio has since renumbered the Modified New Policy as 53–CLS–04. Ohio refers to this policy in its briefs as the "Court–Ordered Policy." Where higher courts have reversed the Modified Policy's provisions, those provisions no longer bind Ohio's practices, regardless of any action by this Court. Ohio is aware of this: for example, although the Modified New Policy proscribes consideration of non-violent behavior occurring more than five years ago, Ohio currently considers such behavior in deciding to retain level 5 inmates at OSP. (Pls.' Reply 10 n. 2.)

has moved for termination of the prospective relief, the Court determines whether that relief "remains necessary to correct a current and ongoing violation of a Federal right" *Id.* Because this case involves the alleged deprivation of the Plaintiffs' Due Process rights, the Supreme Court's holdings in *Mathews, Hewitt, Greenholtz,* and *Wilkinson* guide this Court's determination of whether the Plaintiffs suffer "current and ongoing violation" of their Due Process rights. If such a violation is found and the Court determines that prospective relief is necessary to correct it, the Court must order relief that "is narrowly drawn and the least intrusive means necessary." *Id.*

### III. Legal Analysis

In their dispute over whether continuing prospective relief is appropriate, the parties essentially raise four issues.[3] First, Ohio argues that no court, including the Supreme Court and this Court, has the authority to order it to implement procedural protections. Ohio says that because the New Policy is not now in effect, the Plaintiffs have presented no "case or controversy" and the Court is without authority to order relief. As a result, it says, it is free to fashion its own policy—and to gauge its constitutionality—without regard for the Supreme Court's holding. In response, the Plaintiffs say that because Ohio is presently infringing their Due Process rights, a valid case or controversy exists.

Next, the Plaintiffs say that, contrary to Ohio's representations to the Supreme Court, Ohio is not executing the New Policy as the Supreme Court described it. Surprisingly, Ohio does not dispute that. Ohio essentially argues that while the Court spent great effort discussing the constitutionality of the New Policy as it understood it, the Court merely held that the policy's elements were sufficient (but not necessary) to withstand constitutional muster.

Next, the Plaintiffs argue that the involuntary placement of level 4 inmates at OSP violates Due Process. Ohio counters that because the Plaintiffs do not show the existence of any level 4 inmates at OSP who have not consented to placement at OSP, they lack standing to assert the claim.

Finally, the Plaintiffs argue that certain level 5 OSP inmates are "longtermers." That is, Ohio transferred them to OSP without Due Process and told them that they should expect to stay for a very long time regardless of their behavior. Responding, Ohio argues that in making the determination of their length of stay, it considered all the factors that Due Process requires.

The Court addresses the parties' arguments over each issue in turn.

### A. Whether Courts Have the Authority to Order the New Policy's Implementation

First, Ohio asserts that the courts "[do] not have the authority" to order it to implement the New Policy. Ohio provides little authority for this bold proposition, except to argue that (1) "[t]he State of Ohio has the freedom to develop and implement a policy of its choice so long as the provisions of that policy ... comply with the Due Process Clause" and (2) that the issue presents no "case or controversy." (Defs.' Opp'n Cont. Juris. 4.)

---

**3.** In their reply to Ohio's *Memorandum in Opposition* [Doc. 654], the Plaintiffs raise a new issue: level 5 inmates' alleged insufficient access to counsel. Because the Plaintiffs raised it for the first time in their reply, Ohio has not had a chance to respond to the issue. Therefore, the Court does not address that issue in this Order.

■ Ohio's statement in support of its first argument is partially correct. A court cannot order the state to provide additional protections where the policy is otherwise lawful. But here, the Plaintiffs allege that Ohio's current policy does not comport with constitutional requirements. In response, Ohio says the current policies are sufficient. When presented with such a dispute, courts need to make that determination. It is not within the state executive or its agencies' purview to definitively determine whether its practice comports with constitutional requirements. It is long held that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *United States v. Morrison,* 529 U.S. 598, 616, 120 S.Ct. 1740, 1753, 146 L.Ed.2d 658 (2000) (quoting *Marbury v. Madison,* 5 U.S. 137, 177 1 Cranch 137, 2 L.Ed. 60 (1803)); *Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958) (one "permanent and indispensable feature of our constitutional system" is that "the federal judiciary is supreme in the exposition of the law of the Constitution"). Although Ohio can (and should) attempt to construct a policy that adheres to constitutional standards, the judiciary, including the federal judiciary, up to the United States Supreme Court, finally decides whether the state's policy is constitutional.

■ Moreover, it is well-settled that where a constitutional violation is shown, federal courts can order governmental entities to implement remedial measures. Case law makes this clear: "Orders to responsible public officials to prepare and submit plans for remedying constitutional violations are not uncommon. . . . [I]n the prisoner context the courts have authority to order local officials to take costly measures to cure constitutional violations." *Inmates of Allegheny County Jail v. Wecht,* 874 F.2d 147, 150 (3d Cir.1989).

Ohio argues that no court can order it to implement the New Policy because Ohio can choose any (constitutional) policy it likes. In other words, Ohio seems to believe that federal courts cannot tell it what to do; they can only tell it what *not* to do. This argument misconstrues the issue. Courts rule on discrete cases. However, when courts make rulings, those courts proscribe standards that, unless reversed by a reviewing court, control the issue going forward. A state cannot simply ignore a court's mandate by adopting a policy that is slightly different, and equally deficient. Ohio cannot perpetually avoid review by adopting a new policy just as its current policy's constitutionality is challenged. The Supreme Court ruled on the New Policy, and that ruling controls Ohio's actions.

Ohio next argues that the courts lack authority over it because of the "case or controversy" constitutional principle. Though it does not fully articulate its theory, Ohio seems to argue that the Court cannot impose a remedy because the case is moot.[4]

That a case's becoming moot removes a federal court's jurisdiction is well established. *See Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374–75, 78 L.Ed.2d 58 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.") (citing *DeFunis v. Odegaard,* 416

---

4. The Plaintiffs respond to Ohio's case or controversy argument by stressing that Ohio's practices pose an imminent harm to the Plaintiffs. That argument seems to address the Plaintiffs' standing. However, it is undisputed that Ohio's policies can injure the Plaintiffs; even Ohio does not suggest otherwise. So as described below, a more likely basis for Ohio's case or controversy argument is the mootness doctrine.

U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974)).

Ohio argues that it never put the New Policy into effect because this Court held it invalid and ordered modifications. Therefore, it says the policy that it implemented was actually *a different policy*—the Modified New Policy (what it calls the Court–Ordered Policy). As a result, Ohio argues, any claims that Ohio is not properly implementing the New Policy present no controversy because the New Policy is not—and never was—in effect; the *Modified* New Policy is. Thus, Ohio says, although the validity of the New Policy may have originally presented a proper controversy, the state's abandoning that policy renders the issue moot.

But Ohio cannot evade judicial review with semantics. Irrespective of the label, the Court reviews the practices to determine constitutional conformity. Whatever Ohio calls its policy, that policy is effectively the New Policy it proposed in January 2002. Claiming that it does not *call* its current policy the "New Policy" does not shield Ohio from the Supreme Court's mandate.

Ohio's argument also betrays a limited comprehension of the case or controversy doctrine. First, this Court has already found that, notwithstanding Ohio's creative policy nomenclature, the New Policy is the policy currently governing placement and retention decisions. But assuming, *arguendo*, that Ohio is correct that it has abandoned the New Policy, the question is still not moot.

Well-settled doctrine permits exceptions to the mootness rule under some circumstances. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 708, 145 L.Ed.2d 610 (2000) ("voluntary cessation" exception); *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 594, 119 S.Ct. 2176, 2184, 144 L.Ed.2d 540 (1999) ("capable of

repetition, yet evading review" exception). The present situation falls under both the *voluntary cessation* and *capable of repetition, yet evading review* exceptions to the mootness doctrine.

■ The voluntary cessation exception holds that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc.,* 528 U.S. at 189, 120 S.Ct. 693 (citing *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152). But for this exception, "courts would be compelled to leave [t]he defendant ... free to return to his old ways." *Id.* at 289 n. 10, 102 S.Ct. 1070 (internal quotations omitted). Here, Ohio says that it has voluntarily ceased implementation of the New Policy. And as it repeatedly emphasizes, it is free to adopt a new policy at its discretion. Such a future policy could run afoul of Due Process requirements. Therefore, the voluntary cessation exception squarely applies in this case, rendering it justiciable.

The case is also a proper case or controversy because of a similar mootness exception termed "capable of repetition, yet evading review." *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 594, 119 S.Ct. 2176, 2184, 144 L.Ed.2d 540 (1999); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (citing *S. Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (coining the phrase)). The exception applies where the following two circumstances are present: "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again...." *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing *Lewis v. Cont'l Bank*

*Corp.,* 494 U.S. 472, 481, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400 (1990)). Here, a challenged practice (a given placement and retention policy) could theoretically last long enough to survive review. However, Ohio has implemented a new policy three times in the last seven years. Given the novel challenges that accompany administering a super maximum security prison, such changes can be expected. But those changes also decrease the likelihood that the litigation process would resolve a challenge to a given policy before a new one is implemented. Justice Kennedy aptly characterized the situation during oral argument when he described Ohio's policy as "sort of a moving target that we're working with." (Sup.Ct. Oral Arg. 43.) Thus, the first prong is satisfied.

Second, given that many of the Plaintiffs are serving lengthy prison terms, it is not unlikely that Ohio will amend its policy again sometime during their incarceration. Such a change could implicate the Plaintiffs' Due Process rights. This fact creates the requisite "reasonable expectation that the same complaining party [will] be subject to the same action again," satisfying the second prong of the *Spencer* test. For these reasons, the action is not moot. A valid case or controversy exists and the issue is properly justiciable.

Irregardless of this discussion, the case is not moot because the Plaintiffs allege that the *current* policy at OSP violates their constitutional rights. The current policy and practice, not some potential or former policy, is at issue.

Having established the Court's authority over this matter, the Court turns to the substantive issues in this case.

## B. The Process Due Inmates Placed at OSP

The bulk of the parties' dispute is over the proper interpretation of the Supreme Court's *Wilkinson* decision. To ascertain whether an ongoing violation is present, the Court first determines Ohio's current practice for placement and retention of inmates at OSP.

### 1. *Ohio's Current Policy*

Ohio has made various representations about its current practices that are difficult to reconcile. First, in its *Brief for Petitioners* to the Supreme Court, Ohio outlined how the New Policy would function. Before doing so, Ohio assured the Court that "[t]he procedures described below are those . . . that the [New] Policy will provide if this Court reverses[ ]." Now, although the Court *did* reverse, Ohio says that it never adopted the New Policy. In fact, Ohio now says that it may (and does) ignore the Supreme Court's *Wilkinson* holding regarding the New Policy.

But in pleadings before this Court, Ohio claims that it readily adheres to this Court's May 15, 2002 Order [Doc. 284] (the Modified New Policy), an Order that it has lambasted since its inception. After Ohio appealed that Order to the Supreme Court, that Court held that all of the modifications that this Court imposed—and that were written into the policy—were in error and that Ohio need not follow them. *Wilkinson,* 125 S.Ct. at 2393. Yet Ohio inexplicably claims that since June 5, 2002, that Modified New/Court–Ordered Policy "has governed and continues to govern the procedural process for the placement and retention of Level 5 inmates at the OSP." (Defs.' Opp'n Cont. Juris. 4.) In other words, Ohio implies that it has voluntarily chosen to retain all of the court-ordered requirements against which it argued so vigorously, and which the Supreme Court declared were unnecessary.

The evidence tells yet another story. Although Ohio may call its current official policy the "Court–Ordered Policy," the Plaintiffs provide evidence that Ohio does

not actually comply with that policy's court-ordered provisions or with the process that Ohio told the Supreme Court that it followed.

Both this Court and the Supreme Court found that notice and an opportunity to respond were important to the process to be given inmates before placement at OSP. The Plaintiffs first claim that Ohio does not provide inmates' access to the Security Designation Long Form or the Supervision Review Form prior to a placement or retention hearing. (Pls.' Mot Ext. Juris. 5.) Moreover, they say that the Long Form does not summarize the conduct or offense triggering the review. (*Id.* at 6.)

Next, the Plaintiffs say that even when the classification committee recommends against OSP placement or recommends a security level reduction, a higher authority can override that recommendation without any hearing or opportunity for the inmate to offer argument. (*Id.* at 9; Pls.' Exs. 31B, 31 C, and 31 D.)

Finally, the Plaintiffs argue that the New Policy, on its face (as opposed to the Supreme Court's description), does not give inmates the right to a statement of reasons for an OSP placement decision. (Pls.' Mot Ext. Juris. 10.) Instead, they say, it only requires notice of a decision. (*Id.*)

Ohio does not dispute the Plaintiffs' assertions of its current practices, but nonetheless maintains that the Modified New/Court–Ordered Policy governs its practice. But as discussed above, Ohio's "policy of record" is not necessarily its policy in reality. Whatever Ohio may *call* the policy it now uses, Ohio's actual practices regarding OSP placement and retention are not those of the so-called "Court–Ordered Policy." Instead, Ohio's practices are closer to those contained in the New Policy as it presented it in January 2002.

For clarity then, this Opinion will refer to Ohio's current policy and practice for the placement and retention of inmates at OSP as the "New Policy," the same policy that the Supreme Court considered in *Wilkinson.*

### 2. *The Supreme Court's* Wilkinson *Mandate*

Given that the Supreme Court had the authority to order Ohio to implement certain policies, this Court turns to the question of what precisely the *Wilkinson* Supreme Court holding requires. Having determined what Ohio's current practice *is*, the Court now determines what Due Process *demands* in an inmate placement and retention practice.

In its analysis of the New Policy, the Supreme Court relied on *Sandin* to affirm this Court's and the court of appeals' finding that a liberty interest exists in avoiding confinement at OSP. *Wilkinson,* 125 S.Ct. at 2393–95. The Court then proceeded to determine what process is due using the *Mathews* factors.[5]

In gauging the scope of its policy and holding it constitutional, the Supreme Court relied largely on Ohio's written and oral representations of the New Policy. *See id.* at 2390 ("[W]e construe [the New Policy] based on the policy's text, the accompanying forms, and the parties' representations at oral argument and in their

---

5. Those factors are:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

briefs."). Moreover, the Court made clear that "[i]f an inmate were to demonstrate that the New Policy did not in practice operate in this fashion, resulting in a cognizable injury, that could be the subject of an appropriate future challenge." *Wilkinson*, 125 S.Ct. at 2398.

The Court applied the three *Mathews* factors to the New Policy as the Defendant represented it. In deciding that the policy contained sufficient procedural safeguards against erroneous placement, the Court explicitly discussed five aspects of the New Policy. Those are the following: (1) that inmates receive notice of the charges against them before a hearing; (2) the inmate's right to submit objections before the final level of review; (3) that one reviewer's recommendation against OSP placement terminates the process; (4) that the decisionmaker provides a short statement of reasons justifying the recommendation for OSP placement or retention; and (5) that inmates receive a placement review within 30 days of arriving at OSP. *Id.* at 2396. The Supreme Court gave significant discussion to giving inmates sufficient notice of the grounds for OSP placement, to the importance that a decision by a classification committee or warden against placement at OSP not be reversed at a higher level, and to the need to provide the inmate with a statement of the reasons for OSP placement or retention. While it did not explicitly state that each of these procedures is constitutionally required, the Court used these as central support for its finding that Ohio's procedures passed constitutional muster under the *Mathews* factors. The parties now dispute the proper interpretation of the holding.

Ohio interprets the Supreme Court's *Wilkinson* decision to create a low standard for notice and hearing. In contrast, the Plaintiffs interpret the Court's decision to require Ohio to provide the procedural protections that Ohio promised the Supreme Court it would employ.

To resolve this dispute, the Court analyzes the Supreme Court's holding on the three procedures in question. A review of the Court's decision reveals that the Plaintiffs' position is compelling. The Court finds the three procedural elements it seeks are critical to the constitutionality of a placement and retention policy.

a. *Security Designation Long Form ("Long Form")*

The Plaintiffs say that Ohio currently fails to give sufficient notice of the grounds for placement or retention at OSP. During oral argument, Ohio Attorney General Petro argued that Ohio gave inmates sufficient notice of the grounds for placement at OSP. He told the Justices that prior to a placement hearing, Ohio provided the inmate access to a form (the Long Form) containing the charges against him.

MR. PETRO: He [the inmate] will get the—there is a form that is completed, a long form that is completed by the prison officials that basically stipulates the predicate act or the predicate acts that really result in the reclassification action.

JUSTICE SOUTER: So that in [a situation where an inmate is charged with being a gang leader], he will be told that it's because he is accused of being a gang leader that this is occurring.

MR. PETRO: Yes, because that is part of the form.

(Sup.Ct.Oral.Arg. Tr. 19–20.) The Court apparently relied on these assurances when it held the New Policy facially valid: "At the time of notice, the inmate also has access to the Long Form, which details why the review was initiated." *Id.* at 2390. "The New Policy provides that an inmate must receive notice of the factual basis leading to consideration for OSP place-

ment and a fair opportunity for rebuttal. Our procedural due process cases have consistently observed that these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Id.* at 2396 (citing *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 15, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)). Thus, the Court held that notification of the "factual basis leading to consideration for OSP placement" is an important element of a placement policy.

#### b. *Recommendation Against Placement at any Level Ends the Process*

The Plaintiffs say that Ohio currently allows a higher reviewing authority to reverse a decision of the Classification Committee or a Warden who has recommended against placement at OSP. The Plaintiffs say that Ohio allows such reversals without hearing or opportunity for the inmates to participate.

The Plaintiffs argue that the Supreme Court believed that under the New Policy, a decision at any level against OSP placement or retention would terminate the process. Thus, they say, Ohio must adopt this practice. Ohio disagrees for the same reasons described above.

The Supreme Court described Ohio's commitment regarding how its controlling policy worked: "If the Committee does not recommend OSP placement, the process terminates." *Id.* at 2390 (citing *Brief for Petitioners* 9). "If, after reviewing the CCR, the warden (or the designated official) disagrees and concludes that OSP is inappropriate, the process terminates and the inmate is not placed in OSP." *Id.* The Court elaborated:

> Although a subsequent reviewer may overturn an affirmative recommendation for OSP placement, the reverse is not true; if one reviewer declines to recommend OSP placement, the process terminates. This avoids one of problems ap-

parently present under the Old Policy, where, even if two levels of reviewers recommended against placement, a later reviewer could overturn their recommendation without explanation.

*Id.* at 2396.

Thus the Court considered it troublesome that a single reviewer had the power to disregard other decisions against OSP placement and order such placement without notice or opportunity to respond. This practice is particularly worrisome because the final decision is often made without explanation.

#### c. *Final Decisionmaker Must Provide a Statement of Reasons*

The Plaintiffs say that Ohio is failing to give inmates a justification for decisions to place or retain them at OSP. Ohio responds that it is under no obligation to do so, and that *Greenholtz* and *Hewitt* require it to provide only a decision.

But the Supreme Court believed that the New Policy provided a statement of reasons. "If the recommendation is OSP placement," the Court stated, "Ohio requires that the decisionmaker provide a short statement of reasons." *Id.* at 2396.

As relied upon by the Court: "If the [Classification] Committee does recommend OSP placement, it documents the decision on a 'Classification Committee Report' (CCR), setting forth 'the nature of the threat the inmate presents and the committee's reasons for the recommendation,' as well as a summary of any information presented at the hearing." *Id.* at 2390. The Court described the notice and review process:

> The annotated CCR is served upon the inmate, notifying him of the Classification Committee's and warden's recommendations and reasons.... After the 15-day period, the Bureau of Classifica-

tion reviews the CCR and makes a final determination. If it concludes OSP placement is inappropriate, the process terminates. If the Bureau approves the warden's recommendation, the inmate is transferred to OSP. The Bureau's chief notes the reasons for the decision on the CCR, and the CCR is again provided to the inmate.

*Id.* at 2391.

Finally, the Court reiterated the importance of this process: "This requirement guards against arbitrary decision making while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review. The statement also serves as a guide for future behavior." *Id.* at 2396.

For each of these three policy elements, Ohio essentially believes that the Court's discussion was merely dicta. Ohio argues, contrary to the Plaintiffs' interpretation, that the discussion did not establish a constitutional "floor" such that a policy with fewer procedural protections would fail to satisfy Due Process.

 The Court disagrees. In its discussion, the Supreme Court described the characteristics that a placement and retention plan needs to pass constitutional muster. Ohio's argument to the contrary— that the holding is no more than one example of a valid policy—is without merit for four reasons.

 First, when the Supreme Court rules, it intends that its words will guide the future actions of those before and not before the Court. That is, it will create precedent. Adam S. Hochschild, *The Modern Problem of Supreme Court Plu-*

*rality Decision: Interpretation in Historical Perspective,* 4 Wash. U.J.L. & Pol'y 261, 261 (2000) ("Our jurisprudential tradition further assumes that all cases elaborate a general rule of decision, or *ratio decidendi,* that applies to future cases involving similar issues."); Eugene Wambaugh, The Study of Cases § 7 (1894) (stating that "although the court can pass upon no case except the one before it, the decision is a precedent for all cases in which the circumstances do not differ materially from the circumstances upon which the decision is made").[6] *Ratio decidendi,* Latin for "the reason for the decision" means "the principle or rule of law on which a court's decision is founded." Black's Law Dictionary (8th ed.2004). Through the principle of *stare decisis, ratio decidendi* (unlike *orbiter dicta*) constitutes binding precedent on lower courts. *Harkless v. Sweeny Ind. School Dist.,* 427 F.2d 319, 321 (5th Cir.1970) (holding that "under our system of law, a decision of a higher court is binding as a precedent to the extent of the ratio decidendi of the case"). As described, the Supreme Court undertakes a thorough discussion of the New Policy's novel elements and then explains why those protections render the policy adequate. In so doing, it clearly makes the elements of Ohio's New Policy its primary *ratio decidendi,* the essential foundation for its decision.[7] The Court's discussion of those three elements therefore constitutes binding precedent.

Second, nowhere does the Court imply that something less than what it described would suffice. Instead, the Court holds that "Ohio's New Policy [as discussed here] provides informal, nonadversary pro-

---

**6.** In a notable exception to this rule, the Court in *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), explicitly limited the holding's authority to the facts in that case. *Id.* at 109, 121 S.Ct. 525 ("Our consideration is limited to the present circumstances....").

**7.** In its remand order, the Court directed: "the case is remanded for further proceedings consistent with this opinion." *Wilkinson,* 125 S.Ct. at 2398. The Court therefore contemplated that its holding would form a directive for the courts to enforce.

cedures *comparable* to those we upheld in *Greenholtz* and *Hewitt,* and no further modifications are necessary in order to satisfy due process under the *Mathews* test." *Wilkinson,* 125 S.Ct. at 2398 (emphasis added).

Third, and most damaging to the Defendants, the Court makes clear that Ohio's failure to adhere to the procedures it describes could invite additional litigation: "If an inmate were to demonstrate that the New Policy did not in practice operate in this fashion [as we have described it], resulting in a cognizable injury, *that could be the subject of an appropriate future challenge." Id.* (emphasis added). In light of this language, Ohio cannot reasonably argue that the Supreme Court did not intend Ohio to implement the policy that it and the Court described. The Plaintiffs have demonstrated—and the Defendants have not disputed—that Ohio's current policy does not "operate in [the] fashion" that the *Wilkinson* Court described. The Plaintiffs have alleged a "cognizable injury" because of this failure. This is precisely what the Court stated would be sufficient to mount a future challenge.

Fourth and finally, the Court found that in the present case, *Greenholtz* and *Hewitt* "remain instructive for their discussion of the appropriate level of procedural safeguards. Ohio's New Policy provides informal, nonadversary procedures *comparable* to those we upheld in *Greenholtz* and *Hewitt....*" *Wilkinson,* 125 S.Ct. at 2397 (emphasis added).

Thus, even if the Court did not discuss the New Policy's elements for the purpose of establishing a constitutional floor, the Court explicitly stated that the New Poli-

cy's procedures were "comparable" to those the Court deemed to be the constitutionally "appropriate level." *Id.* at 2397. This language leads to only one reasonable conclusion: because the New Policy's procedural protections are comparable to those that the Court continues to hold are constitutionally required, a policy with a substantially lower level of protection than the New Policy's would fall below the Court's *Hewitt* and *Greenholtz* standard. That is, a challenged policy's "level of procedural safeguards" must, at a minimum, be *comparable* to the New Policy procedures that the *Wilkinson* Court described.[8]

The Defendants' argument to the contrary relies heavily on the Court's language: "Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedure set forth in *Greenholtz* ... and *Hewitt* ... provide the appropriate model." *Wilkinson,* 125 S.Ct. at 2397 (internal citations omitted).

Ohio's reliance is misplaced. Read in context of the rest of the opinion, it is clear that the Court is merely reiterating the broad rules announced in those cases, rules that do not conflict with the additional guidance that *Wilkinson* provides. Moreover, the Court's language expressly endorses *Greenholtz* and *Hewitt* for its "informal, nonadversary" procedures. That statement cannot reasonably be read to retract the *Wilkinson* Court's clear pronouncements about, e.g., notice of charges via a written form being "among the most important procedural mechanisms for pur-

---

**8.** The Court's opinion preserves the possibility that a policy that featured most—but not all—of these protections might conceivably still be constitutional. The Defendants, however, suggest that their current policy, which is devoid of nearly all of them, is still sufficient.

This is a wholly unreasonable reading of the opinion. As discussed, the Supreme Court held the New Policy constitutional *because* it featured the procedural protections described above.

poses of avoiding erroneous deprivations."
*Id.* at 2396.

The Defendants' current policy is devoid of most of the procedures that the *Wilkinson* Court described. Moreover, the policy lacks the elements that formed the *ratio decidendi* of *Wilkinson.* Finally, the policy is wholly *in* comparable to that which that Court upheld. As a result, it falls short of the Court's established *Hewitt* and *Greenholtz* standards and violates the Plaintiffs' Procedural Due Process rights.

This holding should not be read to imply that the Constitution prohibits Ohio from ever modifying its policy without court approval. The Court is sympathetic to the difficult decisions and nimble adaptations that prison officials must make. The Court further recognizes that those officials are usually the ones best equipped to make such decisions.

But any modifications that change the procedures from those described in *Wilkinson* must provide comparable protections to *Wilkinson's.* They must also address the sensitivities the Court articulated therein. Ohio's current practice fails to do so. Thus, it violates the Plaintiffs' right to Due Process of Law.

### IV. Level 4 Inmates' Involuntary Placement at OSP

Next, the Plaintiffs ask this Court to issue an Order preventing Ohio from placing or retaining any level 4 inmates at OSP involuntarily. Ohio responds, arguing that the Plaintiffs have failed to show that any level 4 inmates are so confined. As a result, Ohio says, the Plaintiffs lack standing to seek this relief.

 The Court finds that the Plaintiffs lack standing. To establish standing, a plaintiff must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent." Sec-

ond, a plaintiff must establish "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] some third party not before the court.' Third, a plaintiff must show the 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 225–26, 124 S.Ct. 619, 707, 157 L.Ed.2d 491 (2003) (internal citations omitted).

Ohio appears to challenge the Plaintiffs' standing under the first prong, that the "alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

The Court has only received evidence that the only level 4 inmates at OSP are those who have consented to such placement. This Court has previously found a liberty interest in avoiding placement or retention at OSP, but has also found that inmates can waive that interest. *See* May 15, 2003 Order at 22 ("[T]he Court finds that the inmates waived their right to challenge the procedure used to place or retain them at Level 4.") The Plaintiffs show no evidence that level 4 inmates are being held at OSP without consent and without waiver of their hearing rights.[9] As a result, the Plaintiffs lack standing to assert this claim.

### V. Longtermers

Finally, the Plaintiffs say that there are several inmates, the so-called "longtermers," whom Ohio has said will remain at OSP permanently or for many years regardless of their conduct. The Plaintiffs say that this violates Due Process because the length of their stay at OSP is a prede-

---

**9.** The Court cautions that while the Plaintiffs currently lack standing, a Plaintiff could attain standing in the future if Ohio confined a level 4 inmate to OSP involuntarily.

termined decision and the inmates are not afforded meaningful review of their conduct. The Plaintiffs seek, among other things, an order requiring Ohio to "reduce to Level 4 all so-called 'longtermers' whose confinement at OSP has been free of serious misconduct while on level 5 at OSP." (Pls.' Mot Order Ext. Juris 18.) Responding, Ohio relies on its aforementioned arguments but also argues that the requested relief is substantive and thus beyond the authority of this court.

■ The Court agrees with the Defendants. To grant the relief that the Plaintiffs seek would tread dangerously close to imposing substantive modifications, an action the Sixth Circuit has said is outside this Court's authority. Moreover, the Court believes that the procedural protections ordered below are sufficient to protect the Due Process of rights of level 5 OSP inmates, including the so-called longtermers. Therefore this other relief "is narrowly drawn" and "the least intrusive means necessary" of protecting the Plaintiffs rights. As a result, granting broader relief would exceed the Court's authority and violate the PLRA. For these reasons, the Court cannot grant the relief the Plaintiffs seek.

## VI. Order

The Court has found that the Defendant's current procedure lacks several essential components that are integral to Due Process. The policy therefore creates "a current and ongoing violation" of the Plaintiffs' constitutional rights. *Id.* § 3626(b)(3). The Court further finds that continued prospective relief and immediate procedural modifications are necessary to correct that violation. For these reasons, the Court orders relief that "extends no further than necessary" and that is "narrowly drawn and the least intrusive means to correct the violation." *Id.* § 3626(b)(3). Because the Court has found that Ohio's

Current Policy affords insufficient protection against erroneous placement under *Mathews*, the following three modifications are necessary Due Process elements under *Hewitt, Greenholtz*, and *Wilkinson*. The Court orders that:

(1) *At least forty-eight hours prior to a classification hearing, Ohio shall provide an inmate facing a reclassification or security review copies of the Security Designation Long Form and the Supervision Review Form to be used at the hearing. These forms (or other written notice, if these specific forms are no longer in use) shall provide, at a minimum, notice of the conduct and/or other factual basis giving rise to the inmate's being considered for placement. The notice need not provide all the evidence against the inmate, but must provide sufficient information to notify the inmate of the reason for his OSP placement consideration and conduct that could result in his OSP retention.*

(2) *Ohio may use a three level placement and retention review process whereby a classification committee, a warden (or representative), and the Bureau of Classification can each review the case of inmates being considered for OSP placement or retention. If a reviewer at any level of the process recommends against OSP placement/retention, the process shall terminate, the decision against placement/retention shall control, and no subsequent reviewer during that investigation shall overturn the recommendation against placement/retention unless Ohio affords notice, an opportunity to respond, and a reasoned decision for any subsequent reversal of an earlier recommendation against placement at OSP.*

(3) *Any prison administrator or administrative entity that recommends or orders an inmate's placement or retention at OSP shall articulate the justifi-*

*cation for the decision in a written statement of reasons. Ohio shall provide the inmate that statement promptly, ensuring him sufficient time to review it, prepare a defense, and file any objections before the next review. The statement need not be lengthy, but must include every basis for the decision, and may not be merely conclusory.*

## VII. Conclusion

For the foregoing reasons, the Court **GRANTS** the Plaintiffs' motion for an Order extending jurisdiction of this Court over Due Process issues for one year. The Court **DENIES** the Defendants' motion to terminate the prospective relief provided by this Court's February and March 2002 Orders. The Court further **ORDERS** Ohio to modify its existing policy to include the procedural modifications described above for the placement and retention of inmates at OSP. Ohio shall fully implement these procedures within six months of this Order, or a final disposition of this matter.

The Court declines to order the Defendants to release all level 4 security classification inmates involuntarily assigned to OSP. Finally, the Court further declines to order the Defendants to take any additional actions, except for those procedures ordered above, with regard to classification consideration of level 5 "longtermers."

IT IS SO ORDERED.